# EXHIBIT A

Richard Martinotti

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

*******************************************************

BOBBY J. CHOPLIN,         )

         Plaintiff, )

   v.                     ) CIVIL ACTION NO.

INTERNATIONAL BUSINESS ) 1:16-CV-1412-TDS-JEP

MACHINES CORPORATION,   )

        Defendant. )

*******************************************************


Video-Recorded 30(b)(6) Deposition

of

INTERNATIONAL BUSINESS

MACHINES CORPORATION

through

RICHARD MARTINOTTI

Chicago, Illinois

October 19, 2017

9:01 a.m. - 2:44 p.m.

Page 2

1
2     The 30(b)(6) deposition of INTERNATIONAL
3   BUSINESS MACHINES CORPORATION through RICHARD
4   MARTINOTTI, held at the law offices of:
5
6
7     JACKSON LEWIS, P.C.
8     150 North Michigan Avenue, Suite 2500
9     Chicago, Illinois 60601
10
11
12     Pursuant to Plaintiff Bobby J. Choplin's
13   Rule 30(b)(6) Notice of Deposition of International
14   Business Machines Corporation, before Pauline M.
15   Vargo, Notary Public and Illinois Certified
16   Shorthand Reporter, Illinois CSR No. 84-1753.
17
18
19
20
21
22
23
24
25

Page 3

1           A P P E A R A N C E S
2   Present on Behalf of the Plaintiff:
3     WHITFIELD BRYSON & MASON, LLP
      900 West Morgan Street
4     Raleigh, North Carolina 27603
      919.600.5000
5   BY:  MATTHEW E. LEE, ESQUIRE,
      matt@wbmllp.com
6
7   Present on Behalf of the Defendant:
8     JACKSON LEWIS, P.C.
      1155 Peachtree Street NE, Suite 1000
9     Atlanta, Georgia 30309.3600
      404.525.8200
10  BY:  JUSTIN R. BARNES, ESQUIRE
      barnesjr@jacksonlewis.com
11
12  Videographer:
13    STEPHAN HOOG
      Golkow Technologies
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1               I N D E X
2           Thursday, October 19, 2017
3   WITNESS                    EXAMINATION
4   RICHARD MARTINOTTI
5     By Mr. Lee.......................Page 11
6     By Mr. Barnes...................Page 192
7     By Mr. Lee......................Page 195
8
9     Afternoon Session Commenced.......Page 138
10
11
12
13
14           E X H I B I T S
15  EXHIBIT                    MARKED FOR ID
16  Exhibit 62   Plaintiff's Rule 30(b)(6)        10
                 Amended Notice of Deposition
17               of IBM, 7 Pages
18  Exhibit 63   Defendant IBM Corporation's      12
                 Objections to Plaintiff's Rule
19               30(b)(6) Notice of Deposition
                 of IBM, 7 Pages
20
21  Exhibit 64   Spreadsheet re ELA/large deal    37
                 transactions, IBM-CHOPLIN004266
                 through IBM-CHOPLIN004271
22
23  Exhibit 65   PowerPoint, "Your 2015 Incentive  66
                 Plan Individual Quota Plan (IQP)
24               - Employees"
                 IBM003725 through IBM003742
25

Page 5

1           E X H I B I T S
2            Continued
3   EXHIBIT                    MARKED FOR ID
4   Exhibit 66  PowerPoint, "Incentives 101"     66
                IBM003655 through IBM003668
5
6   Exhibit 67  PowerPoint, "2015 Sales          66
                Incentives 1H Incentive Plan
                Overview - IBM Commerce -
7               Software"
                IBM003572 through IBM003654
8
9   Exhibit 68  PowerPoint, "Your 2013 Incentive 87
                Plan"
10              IBM003684 through IBM003701
11  Exhibit 69  PowerPoint, "Your 2014 Incentive 87
                Plan Individual Quota Plan (IQP)
                - Managers"
12              IBM003702 through IBM003724
13  Exhibit 70  PowerPoint, "Sales Incentives    89
                Introduction to IBM Incentive
14              Plans for Managers," IBM003669
                through IBM003683
15
16  Exhibit 71  PowerPoint, "What's New in 2015" 93
                IBM003878 through IBM003883
17  Exhibit 72  PowerPoint, "Why does it pay     94
                to care?"
18              IBM004027 through IBM004034
19  Exhibit 73  PowerPoint, "Why does it pay     98
                to care?"
20              IBM003978 through IBM003992
21  Exhibit 74  7/10/15 e-mail from Martinotti  100
                to Moorer, et al
22              IBM000805 through IBM000807
23  Exhibit 75  8/19/15 e-mail from Martinotti  111
                to dos Santos, et al ,
24              IBM000209 and IBM000216
25  Exhibit 76  7/13/15 e-mail from Moorer to   115

                                    2 (Pages 2 to 5)

Richard Martinotti

```
 1              E X H I B I T S
 2                Continued
 3  EXHIBIT              MARKED FOR ID
 4  Exhibit 77  E-mail chain, top e-mail sent   116
              7/14/15 from Moorer to Clarke
 5            IBM000811 through IBM000814
 6  Exhibit 78  E-mail chain, top e-mail sent   117
              7/15/15 from Clarke to Moorer
 7            IBM000826 and IBM000827
 8  Exhibit 79  E-mail chain, top e-mail sent   123
              8/6/15 from Flynn to Moorer
 9            IBM000906 and IBM000907
10  Exhibit 80  E-mail chain, top e-mail sent   130
              8/27/15 from Moorer to Clarke
11            IBM001021 and IBM001022
12  Exhibit 81  8/21/15 E-mail from Bathany to  134
              Maleki, IBM000986
13
    Exhibit 82  PowerPoint, "February 21, 2015  160
14            Business Value Assessment"
              IBM004178 through IBM004187
15
    Exhibit 83  E-mail chain, top e-mail sent   163
16            9/15/13 from Madsen to Madsen,
              et al , IBM001459 through
17            IBM001464
18  Exhibit 84  Opinion in US Court of Appeals, 166
              Fourth Circuit, Jensen v IBM
19            No  05-1611, 11 pages
20  Exhibit 85  Complaint in Superior Court of  168
              CA, San Francisco County,
21            Schwarzkopf v IBM, 44 pages
22  Exhibit 86  Complaint in USDC, Northern     169
              District of CA, Kavitz v IBM
23            18 pages
24  Exhibit 87  Complaint in USDC, Northern     171
              District of Illinois,
25            Rudolph v IBM, 52 Pages
```

```
 1              E X H I B I T S
 2                Continued
 3  EXHIBIT              MARKED FOR ID
 4  Exhibit 88  Complaint in Superior Court of  172
              CA, Los Angeles County,
 5            Gilmour v. IBM, 17 pages
 6  Exhibit 89  Complaint in Superior Court of  172
              CA, San Francisco County,
 7            Kemp v. IBM, 16 pages
 8  Exhibit 90  Complaint in Colorado Denver    173
              County District Court,
 9            Geras v. IBM, 2 pages
10  Exhibit 91  Complaint in District Court,    173
              Douglas County, Nebraska,
11            Bereuter v IBM, 6 pages
12  Exhibit 92  Complaint in State Court of     174
              Fulton County, State of Georgia,
13            Wilson v IBM, 5 pages
14  Exhibit 93  Complaint in USDC, District of  176
              Maryland, Leslie v IBM, 12 pages
15
    Exhibit 94  Filings in USDC, District of    177
16            New Jersey, Pero v IBM, 25 pages
17  Exhibit 95  Complaint in Virginia Circuit   178
              Court, Fairfax County
18            Tang v IBM, 61 pages
19  Exhibit 96  Complaint in Georgia Superior   179
              Court, Fulton County
20            Snyder v IBM, 28 pages
21  Exhibit 97  Complaint in Superior Court of  179
              CA, San Mateo County
22            Pfeister v. IBM, 16 pages
23  Exhibit 98  Complaint in USDC, Middle       180
              District of North Carolina
24            Vinson v IBM, 62 pages
25
```

```
 1              E X H I B I T S
 2                Continued
 3  EXHIBIT              MARKED FOR ID
 4  Exhibit 99  Defendant IBM Responses to      186
              Plaintiff's First Set of
 5            Interrogatories, 13 pages
 6  Exhibit 100  Defendant IBM's First          189
              Supplemental Responses to
 7            Plaintiff's First Set of
              Interrogatories, 6 pages
 8
 9  Exhibit 101  Defendant IBM's First          191
              Supplemental Responses to
10            Plaintiff's Second Set of
              Interrogatories, 7 pages
11                  *   *   *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              E X H I B I T S
 2         PREVIOUSLY MARKED
 3            INTRODUCED AT PAGE
 4  Bathany
    Exhibit 2  Bobby Choplin's incentive plan   62
 5            letter for the first half of 2015
              IBM000011 through IBM000015
 6
 7  Bathany
    Exhibit 3  PowerPoint, "Your 2015 Incentive 70
 8            Plan Individual Quota Plan -
              Managers"
 9            IBM000074 through IBM000091
10  Bathany
    Exhibit 5  1/23/15 E-mail from Bathany to   16
11            Mid Atlantic Commerce Team,
              et al , IBM000219 and IBM000220
12  Bathany
    Exhibit 24  E-Mail chain, top e-mail sent   126
13            8/25/15 from Bathany to Aleardi
              IBM001010 through IBM001014
14
    Exhibit 43  Achievement Detail Report       149
15            re Bobby Choplin
              CHOPLIN0005 and CHOPLIN00006
16
    Exhibit 45  Field Management System         133
17            Incentive Statement re Bobby
              Choplin, CHOPLIN000016 through
18            CHOPLIN000019
                    *   *   *
19
20
21
22
23
24
25
```

Golkow Litigation Services - 877.370.DEPS

Richard Martinotti

## Page 10

1    (Exhibit 62 was marked for
2      identification, as of 10/19/17.)
3    THE VIDEOGRAPHER: We are now on the
4  record. My name is Stephan Hoog. I am the
5  videographer in association with Golkow
6  Technologies.
7    Today's date is October 19th, 2017.
8  The time is 9:01 a.m. as indicated on the
9  video screen. This videotaped deposition is
10  being held in Chicago, Illinois, in the matter
11  of Choplin versus IBM Corporation in the U.S.
12  District Court, Middle District of North
13  Carolina. The deponent is Richard Martinotti.
14    Will counsel please introduce
15  themselves for the video record.
16    MR. LEE: I'm Matthew Lee for the
17  Plaintiff.
18    MR. BARNES: Justin Barnes for the
19  Defendant.
20    THE VIDEOGRAPHER: The court reporter
21  is Pauline Vargo. Can you please swear in the
22  witness.
23    THE REPORTER: Raise your right hand,
24  please, to be sworn.
25    (The witness was duly sworn.)

## Page 11

1      RICHARD MARTINOTTI,
2  called as a witness herein, having been first duly
3  sworn, was examined and testified as follows:
4      EXAMINATION
5  BY MR. LEE:
6    Q. Good morning, Mr. Martinotti.
7    A. Good morning.
8    Q. My name is Matthew Lee. I will be
9  taking your deposition today.
10    Could you please state your full name
11  and residential address for the record.
12    A. Richard Martinotti, M-a-r-t-i-n-o-t-t-i.
13  I live at 30 East Huron, Chicago, Illinois.
14    Q. Mr. Martinotti, I'm showing you what we
15  have marked as Exhibit 62. This is a copy of a
16  30(b)(6), a Rule 30(b)(6) deposition notice that we
17  have issued in this action. Have you seen this
18  before?
19    A. Yes.
20    Q. And do you understand what a
21  Rule 30(b)(6) deposition is?
22    A. Yes.
23    Q. Okay. And you have given several of
24  these before, haven't you?
25    A. Yes.

## Page 12

1    Q. Okay. I understand that you are the
2  only designee today that IBM has presented; is that
3  correct?
4    MR. BARNES: That's correct.
5    MR. LEE: Okay, okay. Fair enough.
6    (Exhibit 63 was marked for
7      identification, as of 10/19/17.)
8  BY MR. LEE:
9    Q. Also, we've marked as Exhibit 63 a copy
10  of objections to this 30(b)(6) notice. These are
11  objections that IBM has made after we issued the
12  notice, and I just want to make sure that we have a
13  clear understanding.
14    Are you prepared to discuss each topic
15  on Exhibit 62 except where IBM has objected there
16  in writing on Exhibit 63 and also indicated it does
17  not intend to produce a witness?
18    A. Yes.
19    Q. Can we rely on your answers and
20  statements today as the answers and statements of
21  IBM?
22    A. Yes.
23    Q. Mr. Martinotti -- I'm pronouncing that
24  right?
25    A. You're good.

## Page 13

1    Q. Great.
2    A. Close.
3    Q. Okay. Would you agree that IBM has an
4  obligation to be honest with its sales
5  representatives?
6    A. Yes.
7    Q. Would you agree that IBM has an
8  obligation to be honest with its sales
9  representatives about their compensation?
10    A. Yes.
11    Q. And compensation includes commissions
12  for sales representatives at IBM, doesn't it?
13    A. Yes.
14    Q. Would you agree that IBM has an
15  obligation to treat its sales representatives
16  fairly?
17    A. Yes.
18    Q. Would you agree that IBM has an
19  obligation to be clear with sales representatives
20  when it explains the terms of their compensation?
21    A. Yes.
22    Q. Would you agree that giving
23  contradictory information to sales representatives
24  is not being clear with them?
25    MR. BARNES: I'm going to object to

Richard Martinotti

**Page 14**

1  the form of that question.
2  BY MR. LEE:
3  Q.  You can answer.
4  MR. BARNES:  Go ahead.
5  THE WITNESS:  Repeat the question.
6  I'm sorry.
7  BY MR. LEE:
8  Q.  Sure.  Would you agree that giving
9  contradictory information to sales representatives
10  about their compensation is not being clear with
11  them?
12  MR. BARNES:  I'm still going to object
13  to the question, but go ahead and answer.
14  BY THE WITNESS:
15  A.  I would say yes.
16  BY MR. LEE:
17  Q.  Would you agree that IBM has an
18  obligation not to mislead its sales representatives
19  about their compensation?
20  A.  Yes.
21  Q.  And would you agree if IBM becomes aware
22  that sales representatives are confused about their
23  compensation or misunderstand the terms of the
24  plan, IBM has an obligation to make reasonable
25  efforts to clarify the plan?

**Page 15**

1  A.  Clarify it with the individual, yes.
2  Q.  Why do you make that qualification?
3  A.  Aside from the fact that -- I mean, you
4  know, to me I -- it's -- as the employee -- we've
5  got 400,000-plus employees, so if we have an
6  employee that has a question, I would expect his
7  first-line manager to be able to explain the sales
8  plan to the employee, yes.
9  Q.  Mr. Martinotti, would you agree that
10  it would be wrong for IBM to profit from sales
11  representatives' confusion about its compensation
12  plan if IBM is aware of the confusion and doesn't
13  try to address it?
14  MR. BARNES:  I'm going to object to
15  that question.
16  BY MR. LEE:
17  Q.  You can answer.
18  A.  I would say yes.
19  Q.  Mr. Martinotti, would you agree that
20  it's reasonable for sales representatives to rely
21  on what IBM tells them about their compensation
22  plan?
23  A.  Yes.
24  Q.  When explaining his compensation plan
25  for the first half of 2015, IBM represented to

**Page 16**

1  Bobby Choplin that his earnings opportunity remains
2  uncapped.  Is that your understanding?
3  MR. BARNES:  I'm just going to object
4  to that question.
5  MR. LEE:  I can rephrase it.
6  BY MR. LEE:
7  Q.  Would you agree that IBM represented to
8  Bobby Choplin when explaining his compensation for
9  the first half of 2015 that his earnings
10  opportunity remains uncapped?
11  A.  I can't tell you specifically what the
12  conversation that they had between the two of them,
13  but I know that we have education packages that the
14  managers are given to review with their employees.
15  Q.  And I just need to make sure that this
16  is entirely clear because this is an important
17  aspect of the case that's being litigated right
18  now.  You understand that, don't you?
19  A.  Yes.
20  Q.  I'm showing you what we have previously
21  marked as Exhibit 5.
22  MR. LEE:  Justin, I think you --
23  MR. BARNES:  I've got a copy.
24  MR. LEE:  Okay, okay.
25

**Page 17**

1  BY MR. LEE:
2  Q.  Have you seen this before?
3  A.  Yes, I have.
4  Q.  Okay.  Do you recognize the chart that's
5  included in Exhibit 5?
6  A.  I recognize it from this note, yes.
7  Q.  What do you mean?
8  A.  Yeah, I recognize it because it's
9  embedded in this note.  Yes, I recognize this
10  document.
11  Q.  And you have seen this e-mail before?
12  A.  Yes.
13  Q.  So that's how you recognize the chart?
14  A.  Yes.
15  Q.  Have you ever seen it anywhere else?
16  A.  We have it in our education packages.
17  Q.  Okay.  And this is an e-mail that Tom
18  Batthany sent to his team, which includes Bobby
19  Choplin, on January 23rd, 2015, is it not?
20  A.  Commerce team, Bobby Choplin, Jean, yes.
21  Q.  And this is an effort by Tom Batthany,
22  Bobby Choplin's first-line manager, to explain his
23  compensation plan to him for the first half of
24  2015; is that correct?
25  MR. BARNES:  I'm going to object to

Richard Martinotti

Page 18

1   that question, but go ahead.
2   BY MR. LEE:
3       Q.   You can answer.
4       A.   Yes.
5       Q.   When Tom Batthany sent this e-mail, he
6   was doing his job, wasn't he?
7       A.   He was explaining, yes.
8       Q.   Okay. He was explaining --
9       A.   Yes.
10      Q.   -- the compensation plan, which is part
11  of his job, right?
12      A.   Yes.
13      Q.   And if you look down in the chart that's
14  copied there, this chart is -- under "Earnings
15  Opportunity," do you see that?
16      A.   Um-hmm, yes. I'm sorry.
17      Q.   The fourth bullet point, could you read
18  that, please.
19      A.   "Earnings opportunity remains uncapped."
20      Q.   Okay. So you would agree that IBM when
21  explaining his compensation plan for the first half
22  of 2015 represented to Bobby Choplin that his
23  earnings opportunity remains uncapped, wouldn't
24  you?
25      A.   Correct.

Page 19

1       Q.   Would you also agree that IBM
2   represented to Bobby Choplin regarding his first
3   half of 2015 compensation plan that payments were
4   uncapped?
5       A.   Correct.
6       Q.   So would you agree that IBM had an
7   obligation not to cap Bobby Choplin's earnings
8   opportunity?
9       A.   Yes.
10      Q.   Would you agree that IBM had an
11  obligation not to cap Bobby Choplin's payments?
12      A.   Correct.
13      Q.   Mr. Martinotti, could you tell me a
14  little bit about -- you work for IBM, right?
15      A.   Correct.
16      Q.   How long have you worked there?
17      A.   38 years.
18      Q.   That's a little while.
19      A.   Unfortunately.
20      Q.   Have you ever worked anywhere else?
21      A.   No. Right out of college.
22      Q.   Right out of college, straight to IBM?
23      A.   Yes.
24      Q.   Have you always lived in Chicago?
25      A.   No.

Page 20

1       Q.   Okay. Tell me about where you went to
2   school. Just pretend that we are at a cocktail
3   party and you are telling me a little bit about
4   your background, where you went to college, what
5   you majored in and then what you did when you got
6   out in the working world.
7       A.   Four years over at Illinois State
8   University over in Bloomington-Normal, Illinois, BA
9   in administration and finance. I graduated during
10  the fall semester, and then in February of '79 I
11  joined IBM. I was in the -- in a IBM Chicago
12  office for 2 years, then went down to Bloomington,
13  Illinois, for 4-1/2 years on the State Farm
14  account; then went back to Chicago for two years;
15  then went to Blooming- -- or Peoria, Illinois, for
16  six years; then two years in Springfield, one year
17  in St. Louis; and then I was back here in Chicago
18  for the rest of the time.
19      Q.   Okay. Take me through what your
20  positions were. Have you ever had a sales
21  position?
22      A.   Not a sales position.
23      Q.   Okay. I'm sorry. I jumped in,
24  interrupted myself with another question.
25           So you never had a sales position. Take

Page 21

1   me through your positions at IBM.
2       A.   Administration and then finance.
3       Q.   Okay. What does that entail?
4       A.   Administration; in the earlier part of
5   my career I managed the administrative staffs, the
6   asset staffs that were originally housed here in
7   each of the offices. They did all of the ordering
8   of the products; I'm doing all of the compensation
9   calculations and accounts receivable, then moved
10  into the finance side of it, which was more focused
11  on going through and dealing with the quotas, the
12  budgets and compensation.
13      Q.   Okay. And part of your job today is to
14  review commissions to determine whether they are
15  appropriate for sales representatives; is that fair
16  to say?
17      A.   I don't review them. I implement the
18  programs for the review process. So, what I will
19  do is I will manage the -- the process, the
20  physical review, the physical determinations of
21  decisions are done by the line management, the line
22  sales management; and then I will implement based
23  on what they come forward with.
24      Q.   Who is included in the line sales
25  management?

Richard Martinotti

Page 22

1      A.   So the line sales management would be
2  the first line manager, the second line manager of
3  the sales individual and their senior executive
4  staff.
5      Q.   And so that would depend on what
6  department it was in?
7      A.   Um-hmm.
8      Q.   Is that a yes?
9      A.   Oh, I'm sorry.  I apologize.
10     Q.   That's fine.
11     A.   Yes.
12     Q.   Not a problem at all, and I'm not trying
13  to be rude when I say that.  I just want to try
14  and --
15     A.   I get it.  I forgot, yeah.
16     Q.   And so for Bobby Choplin, his first line
17  manager was Thomas Batthany, correct?
18     A.   Yes.
19     Q.   The second line manager was --
20     A.   Haleh.
21     Q.   -- was Haleh Maleki?
22     A.   Haleh, yeah.  I caught it, sorry, yeah.
23     Q.   I got corrected on that.
24     A.   Well, sorry, yeah.
25     Q.   No, that's okay.

Page 23

1      A.   And then Sean Flynn.  Well, so Sean
2  Flynn is the Commerce senior executive within North
3  America.  He runs the brand.  He -- the sales
4  teams, the brand sales teams dotted-line into Sean.
5  And by "dotted line," I say they have directional
6  and review and HR, you know, type responsibilities.
7      And then within the branch or the region
8  that they are in back in that terminology, back in
9  2015, Mid-Atlantic, he reported up into the sales
10  management team, which is Randolph Moorer.
11     Q.   Okay.
12     A.   And then Randolph reports up into John
13  Dunderdale.
14     Q.   And so the way I understand your
15  testimony is you don't exercise any judgment about
16  what somebody should or should not get paid; is
17  that fair to say?
18     A.   Correct.
19     Q.   Who does?
20     A.   The line management that I just
21  described.
22     Q.   All of them?
23     A.   They all have a piece of it.  The
24  primary or the starting point is the first line
25  manager, and that first line manager then takes

Page 24

1  advice and counsel from, you know, his senior
2  executives.
3      Q.   Where did the buck stop with respect to
4  the decision on Bobby Choplin's BB&T commissions?
5      A.   For this specific, this account level
6  inspection program, it was John Dunderdale.
7      Q.   Okay.  When you say "account level
8  inspection program," that sounds like a specific
9  term.  Is that correct?
10     A.   It's -- it's just a title for the
11  inspection program that was in place for this
12  specific situation.
13     Q.   Okay.  Is that the significant
14  transactions --
15     A.   Yes.
16     Q.   -- review process?
17     A.   Yes.
18     Q.   Okay.  Are there other types of review
19  processes aside from the significant transactions
20  review?
21     A.   Aside from that account level inspection
22  program, there is a number of different significant
23  transaction reviews.  They are all part of that
24  umbrella, but yes, there is a number of inspection
25  programs that we had in place in 2015.

Page 25

1      Q.   Can you help me understand how those all
2  work together?
3      A.   They were in place for specific
4  situations.  So, as an example, the account level
5  inspection program looked at significant large ELA
6  business activity versus we have the absolute sales
7  plan and we had a review within the absolute sales
8  plan process.
9      We have a review in the -- what we call
10  the SaaS or Software as a Service's business,
11  because in the case of the Software as a Services,
12  SaaS, business, that was a brand new business for
13  us; and we want to -- wanted to ensure that the
14  program as we built it was -- was being
15  implemented, so that was the inspection.
16     Q.   Anything other than those three types
17  that you've discussed?
18     A.   There is a number of inspections that
19  are done outside of the software organization.
20  Those three that I've highlighted were specific to
21  the software business.
22     Then, on a broader scale, the business
23  does what's called an out-of-range review with
24  their first line managers.  If someone is
25  significantly out of a range within, you know, a

Richard Martinotti

Page 26

1  specific month of achievement, it triggers a review
2  and, you know, the business asks the first line
3  manager just simply to go through and ensure that
4  there is no anomalies; there is no, you know -- you
5  know, situations whereby the quota was wrong, the
6  revenue was wrong, the territory was set up
7  incorrectly in the sense that, you know, Rick
8  Martinotti should not have been assigned to Acme
9  Paint and he got Acme Paint incorrectly, that type
10 of situation.
11     Q.   Okay.
12     A.   So as to then, you know, avoid going
13 through and inadvertently paying Rick Martinotti
14 for Acme Paint, you know, that type of deal.
15     Q.   And that's the out-of-range review
16 process?
17     A.   Those are the -- yeah, yeah.
18     Q.   So there are four different type of
19 inspection processes that relate to commissions:
20 the account level inspection program, the absolute
21 sales plan process, the SaaS business review and
22 out-of-range review?
23     A.   Correct.
24     Q.   And the account level, that's the one
25 that relates to significant transactions, right?

Page 27

1      A.   All of them relate to significant
2  transactions.  You know, again, in the sense of the
3  out of range, again, like I said, that Acme Paint
4  transaction could have been the driver that brought
5  that person out of range and Acme Paint should not
6  have been assigned to Rick Martinotti.  That is a
7  significant transaction that needed to be addressed
8  and needed to be corrected.
9      Q.   What is a significant transaction?  How
10 is that defined?
11     A.   It's based on the territory and based on
12 the circumstances.  So, in the case of the account
13 level inspection program, we look at transactions,
14 ELA transactions within North America, the North
15 American region at $10 million or greater.
16          However, the line management, the
17 regional VP has the ability to go through and
18 request a review that's, you know, less than that.
19 They have the ability to go through and request it.
20 So, you know, it's circumstance -- it's based on
21 the circumstances of that specific situation.
22     Q.   Could a review ever be triggered just by
23 someone feeling like, wow, that sales rep is going
24 to make a lot of money this period?
25     A.   No.  I mean -- I mean, in the case of

Page 28

1  the account level inspection, as an example, you
2  are tending to go through and do the situation
3  because of it's a complex transaction, there is
4  multiple people there, and you are wanting to
5  ensure that the representation and all of the
6  particulars are correct.
7          In the case of the out-of-range
8  situation, that's not triggered by the first line
9  manager.  That's just triggered by the fact that
10 the circumstances, that the roll-up of the revenue
11 achievement is calculated to be out of range.
12          In the case of the SaaS situation,
13 that's triggered -- originally it was triggered at
14 being 250 percent of plan.  It was raised to 400
15 percent of plan.  But, you know, there is various
16 types of, you know, rationales or triggers.
17     Q.   Are sales reps told that these 250
18 percent or 400 percent thresholds exist?
19     A.   Yes.  They are aware of it.
20     Q.   How do you know that?
21     A.   It's the first line managers in the --
22 it's the first line managers and the second line
23 managers communicating that to the reps, and my
24 conversations with the second line managers and the
25 regional VPs have stated that, you know, that they

Page 29

1  have said that to them.
2      Q.   Is it in -- are those thresholds
3  explained to sales representatives in any of the
4  written materials?
5      A.   No.  The programs themselves are
6  specific to the year, you know, but the significant
7  transaction statement is specifically highlighted
8  and reviewed because it's embedded in the IPL.
9      Q.   Okay.  Is the significant transactions
10 language included anywhere besides the IPL?
11     A.   In the -- there is education packages.
12 No.  I would have to go and look.  I believe that,
13 you know, in the case of the management, you know,
14 correspondence, yes.  It's built into the
15 quota-setting guideline statement.  It's built into
16 the management -- on the manager instructions, the
17 MIOG.  So, from a manager's perspective, yes, there
18 is further documentation and correspondence with
19 regards to significant transaction, you know, and
20 what that means, you know, the scope of it.
21     Q.   Okay.  Can you point to a document that
22 was given to Bobby Choplin that references the
23 significant transaction provision aside from the
24 IPL prior to the BB&T deal being closed?
25     A.   I -- I can't, no.

8 (Pages 26 to 29)

Richard Martinotti

Page 30

1    Q.   So, Mr. Martinotti, what is your title
2  right now at IBM?
3    A.   Finance manager, software.
4    Q.   Okay.  Who is your boss?
5    A.   Scott Goodwin.
6    Q.   Who is Scott Goodwin's boss?
7    A.   Cynthia Alexander.
8    Q.   Is John Dunderdale anywhere in that
9  line?
10   A.   No.  John is line sales.  Scott, myself
11 and Cynthia are finance.
12   Q.   Give me a brief description of what your
13 responsibilities are as the finance manager,
14 software.
15   A.   So, I manage a team that deals with the
16 quota modeling and the revenue recognition and then
17 the commission.  I'm a commissions interface for
18 our incentives team down in Brazil.
19   Q.   Do you work closely with the team in
20 Brazil?
21   A.   Yes.
22   Q.   Have you ever been down there?
23   A.   Unfortunately not.  They don't let me.
24 You know, even my, you know, direct reports, Sharon
25 who reports in to me has been down there, but I

Page 31

1  have not been having the opportunity to get down
2  there.  Even for the Olympics -- even for the
3  Olympics they did not find a reason for me to get
4  down there.
5    Q.   We will put a formal protest on the
6  record here.
7         MR. BARNES:  Yeah, seriously.
8    A.   Exactly.
9    Q.   Since we started talking about this a
10 little bit, I want to go ahead and dig into these.
11       Before I do that, Mr. Martinotti, how
12 many depositions have you testified in?
13   A.   This will be my fourth.
14   Q.   Okay.  Because I think my records
15 indicated you testified at the Kravitz [as
16 pronounced] -- in the Kravitz case, the Schwarzkopf
17 case, the Wilson case and then this would be the
18 fourth deposition?
19   A.   Yes.
20   Q.   Does that sound right?
21   A.   Yeah.
22       MR. BARNES:  Kavitz, K-a-v-i-t-z?
23       MR. LEE:  That might be it.
24       THE WITNESS:  Yeah.
25       MR. LEE:  Did I say that wrong?

Page 32

1         MR. BARNES:  I think you said
2  "Kravitz," but I'm pretty --
3         MR. LEE:  Like Lenny?
4         MR. BARNES:  I'm pretty sure it is
5  "Kavitz."
6         THE WITNESS:  It is "Kavitz," but I
7  kind of figured that's what you meant, yeah.
8  BY MR. LEE:
9    Q.   Okay.  Have you been -- are you aware of
10 any other lawsuits involving a software sales
11 representative that have been filed and relate to a
12 commission payment dispute?
13   A.   Yes.
14   Q.   Tell me about what commissions lawsuits
15 you are aware of.
16   A.   Well, I shouldn't say lawsuits.  I just
17 know that they're -- I have been notified to hold
18 archived documents.  So, whether or not it is in a
19 lawsuit, you know -- you know, nature at this
20 point, I can't tell you that, but I do know that I
21 have two individual, you know, requests to hold
22 documentation.
23   Q.   How many times has IBM been sued, to
24 your knowledge, relating to commissions payments?
25   A.   Oh, I don't know.  Honestly, I don't

Page 33

1  know.
2    Q.   How many are you aware of?
3    A.   Well, these four.  I have been aware of
4  requests for holding documentation that never went
5  -- or at least asked me to do a deposition against,
6  so I don't know if it ever, you know, went further.
7    Q.   How many times has that happened?
8    A.   Probably three or four times.
9    Q.   Are you aware of any times where someone
10 has threatened to file a lawsuit against IBM with
11 respect to a commissions payment but it didn't end
12 up with a letter asking to preserve documents or a
13 filed lawsuit where you gave a deposition?
14   A.   Are you asking whether or not I know of
15 a person saying that "I'm going to sue you" but
16 never does?
17   Q.   Right.
18   A.   Yeah.  I mean, people, you know, spout
19 out things like that, you know, time and time
20 again.  Right?
21   Q.   I mean, does that happen all the time?
22   A.   Well, I mean, I wouldn't say it happens
23 all the time, but it is no different than, you
24 know, a person having an argument and saying, you
25 know, "I'm gonna shoot you" or something.  I mean,

Richard Martinotti

Page 34

1  you know, people have offhanded comments all the
2  time, so I'm not sure where that one is going,
3  where that question is going.
4      Q.   I just want to know how many times you
5  are aware of someone threatening to file a lawsuit
6  or even being upset about a decision on their
7  commissions payment.
8      A.   Let's put it this way:  I have been
9  witness, I have been, you know, on the phone having
10  conversations with a number of salespeople who have
11  been upset and had to be -- you know, we had to
12  talk it further and to get more clarity.  So, I've
13  had conversations in that sense of the word.  I've
14  had a number of those conversations.
15     Q.   Okay.
16     A.   And I've had a number of conversations
17  whereby once we've had more clarity for them, they
18  basically came off the ledge.  Let's put it that
19  way.
20     Q.   Would it be fair to say that they
21  misunderstand IBM's policy with respect to payment
22  of commissions?
23     A.   There is, you know, misunderstanding,
24  yeah.
25     Q.   Is it common for sales reps to

Page 35

1  misunderstand this significant transactions review
2  and the rights that IBM claims to have reserved?
3          MR. BARNES:  I'm going to object to
4     that question, but go ahead.
5  BY THE WITNESS:
6      A.   The issue was it wasn't really
7  surrounding significant transactions.  The
8  questions were about whether or not they were, you
9  know, compensated on a specific set of products or
10  how their -- their, you know, acceleration should
11  be, you know, brought forward.  There was a wide
12  range of rationale behind why people were confused;
13  let's put it that way.
14  BY MR. LEE:
15     Q.   The lawsuits have all dealt with this
16  significant transactions review and adjustments
17  made under that, right?
18     A.   For the four, yes.
19     Q.   Okay.  And then the three or four others
20  where you received a letter, do those all relate to
21  the significant transactions review and commissions
22  adjusted under that provision?
23     A.   Of the letters that I got that says
24  hold, all it says is just hold.  It doesn't tell
25  me, you know, the rationale of what they are doing

Page 36

1  or, you know, what's happening.  It's just that I'm
2  supposed to hold documentation.
3      Q.   But you would have been involved in the
4  review of those commissions for whatever sales rep
5  it related to, right?
6      A.   I would have handled them.  I would have
7  implemented, you know, the situation, yeah.
8      Q.   And so you would know who it related to
9  and have knowledge about under what provision the
10  commissions were adjusted, wouldn't you?
11     A.   I would say if I'm close enough to that
12  specific branch office or that specific sales team,
13  I would know.  But there is, you know, over 3,000
14  people that we have got in North America, so do I
15  know each and every one of them?  No.
16     Q.   I don't mean to say that.  Well, is it
17  common for IBM to conduct a significant
18  transactions review and make an adjustment with a
19  lower commissions paid?
20     A.   I would put it this way:  It is in the
21  case of the account level inspection, any time we
22  did a -- we had an ELA that was 10 million or
23  greater, we did do an account level inspection.
24  Did we go through and adjust anyone within that --
25  within each and every one of them?  No.  There were

Page 37

1  a number of them, of the inspections that we went
2  through and reviewed and released in full.
3          So, I mean, to the point of, you know,
4  the fact that we did a review didn't necessarily
5  mean that automatically it meant that somebody was
6  adjusted.
7      Q.   Okay.  We have received a spreadsheet
8  from IBM's counsel that identified commissions
9  adjustments from 2013 through 2015.  Did you assist
10  in the preparation of the spreadsheet?
11     A.   Show me which one you are talking about.
12         MR. LEE:  I will mark it and give it
13     to you.
14         (Exhibit 64 was marked for
15         identification, as of 10/19/17.)
16  BY MR. LEE:
17     Q.   I am showing you what I have marked as
18  Exhibit 64.
19     A.   Okay.  This is a spreadsheet that I put
20  together for myself, yes.
21     Q.   Okay.  When did you put this together?
22     A.   I started keeping track of it back in,
23  as you see here, in 2013.
24     Q.   Okay.  So you didn't -- you didn't
25  create this for this lawsuit?

Richard Martinotti

Page 38

1    A.   No.
2    Q.   Okay.  What does this show?
3    A.   What this shows is it's a summary of
4  the ELA transactions that we did go through and
5  implemented an account level inspection program on.
6    Q.   So these are only ELA transactions?
7    A.   These are ELA or large deal.  I want to
8  distinct that, because not all of our activity
9  here, if it was a large deal, single, you know,
10  product, it's not an ELA, but if it is still over
11  10 million, we will go and review it.
12    Q.   Okay.  So as we were discussing before,
13  of those four different types of review, this would
14  be all account level inspection reviews?
15    A.   Yes.
16    Q.   Okay.  So it's not absolute sales plan
17  review, it's not a SaaS business review and it's
18  not an out-of-range review, right?
19    A.   Correct, not this spreadsheet, right.
20    Q.   Right.
21    A.   Correct.
22    Q.   And this, to me, it looks like it is
23  organized by account, if I look at the second
24  column.  Is that correct?
25    A.   Yes.  So, it's summarized by quarter and

Page 39

1  then by account and then total revenue of the
2  transactional revenue that we recognized, the
3  commissions that were calculated against that total
4  revenue, any kind of commission holdback that was
5  identified or requested, the net commissions that
6  were released and then simply the E/R, the expense
7  versus the revenue.
8    Q.   Why did you create this spreadsheet?
9    A.   I've always -- I would get periodically
10  questions about a specific transaction or, you
11  know, on average, you know, how many did we do,
12  things of that nature, so for ease of use, instead
13  of me going and pulling all my paper records, I
14  started doing a summary spreadsheet offline.
15    Q.   Okay.  And you said you started in the
16  first half of 2013, not before?
17    A.   Correct.  We have been doing this since
18  2009.
19    Q.   I'm sorry?
20    A.   We have been doing account level
21  inspections since 2009.
22    Q.   Why was that implemented in 2009,
23  if you know?
24    A.   Just because the ELA activity was --
25  that contract was a significant revenue and sales

Page 40

1  plan driver starting in 2009, so we wanted to start
2  going through and just reviewing and ensuring.
3    Q.   You said "that contract."  What are you
4  referring to?
5    A.   The ELA contract.
6    Q.   Oh, okay.  Was there already an existing
7  program for reviewing large deals?
8    A.   There were different reviews, correct,
9  but they were -- they were more done by a given
10  region; and what we did back in 2009 was we
11  consolidated it at the North America level for, you
12  know, a consistency approach.
13    Q.   And so you didn't start a spreadsheet
14  like this in 2009, though; is that your testimony?
15    A.   Correct, I did not.
16    Q.   And what sparked it in the first half of
17  2013?
18    A.   Just the fact that, you know, it was one
19  more request and it's like, okay, from now on I'm
20  going to, you know, make my life easier instead of
21  having to continue to go back into all of my
22  records.
23    Q.   Okay.  How did you gather this
24  information?
25    A.   By the fact that as I started with the

Page 41

1  account level inspections in first quarter, I
2  created the spreadsheet, and then as, you know, the
3  sales plan, the six-month sales plan goes through,
4  you will have first half, second half for a given
5  year, then you'll have the following, you know; and
6  all I do is copy/paste the -- you know, the
7  template over and so that's all this is.
8    Q.   Okay.  Has IBM produced this in any
9  other lawsuits?
10    A.   I don't believe so.  This was the first
11  time I've provided it to, that I was asked if I had
12  it, yeah.
13    Q.   Has IBM produced the information that's
14  on this sheet in another format in any other
15  lawsuits?
16    A.   I -- I don't -- I don't know.
17    Q.   Is there any information on your
18  spreadsheet that's not included on Exhibit 64?
19    A.   Outside of the redacted names, the
20  account names, no.
21    Q.   Okay.  So I went through and I totalled
22  up the net holdback commissions.  Do you have any
23  reason to disagree or dispute that the total of net
24  holdback commissions for the first half of 2013 is
25  2,793,570 -- I'm going to get that out right -- is

Richard Martinotti

Page 42

1   $2,793,575?
2       A.   I don't, because there is a 600,000 -- I
3   would have to add it up myself.  There is 400,000
4   and 600,000, so that in itself is a million, so I
5   can see where it can be 2 million, over 2 million.
6       Q.   And I tried to think of an easy way to
7   do this, and the best I could come up with was for
8   me to add it all up.  So, I'm only asking if the
9   number looks right to you.  Obviously if I made a
10  math error or something like that, we can figure
11  that out.  Okay?
12      A.   Okay.
13      Q.   So for the second half of 2013, do you
14  have any reason to disagree that the total of net
15  holdback for that period was $8,307,299?
16      A.   Try that one again.  You -- I think
17  you've missed --
18          MR. BARNES:  He said second half of
19  '13, I think is what he said.
20          THE WITNESS:  Oh, second half?  I
21  didn't hear the second half.  I heard '13.
22  Okay.
23  BY MR. LEE:
24      Q.   Yeah.
25      A.   So, yeah.  Well, again, there is 2, 3,

Page 43

1   4.  There is 4 million right there.  8 million.
2       Q.   That's right, 8.3.
3       A.   I'll take your word for it.  I didn't --
4   you know, I didn't summarize it, obviously.  That's
5   not something that I was dealing with.  But on the
6   other hand, you know, there is the net commissions
7   along with the -- the total commissions as well.
8       Q.   That information is there too.
9       A.   Yeah.
10      Q.   I agree.  I'm just asking the total of
11  net holdback, if you have any reason to dispute
12  that total, 8.3 million.
13          MR. BARNES:  Let me just interject.
14  Do you want to -- do you want me to
15  double-check your math during a break and then
16  we can just stipulate what the totals are?  Do
17  you think that would be easier?  I mean --
18          MR. LEE:  Whatever makes you
19  comfortable.  That's my sole purpose, is to
20  find out what the total is, so however you
21  guys would feel most comfortable doing that.
22          MR. BARNES:  I just think that would
23  be more efficient than asking Rick to do the
24  math in his head.  I'm happy to total them up
25  on my end, we can compare the numbers during a

Page 44

1   break, and then when we go back on the record
2   we can...
3           MR. LEE:  Let's go off the record.
4           THE VIDEOGRAPHER:  Going off the
5   record at 9:43 a.m.
6           (Discussion was had off the
7           record.)
8           THE VIDEOGRAPHER:  We are back on the
9   record at 9:49 a.m.
10  BY MR. LEE:
11      Q.   So we've just spent some time off the
12  record making sure that all of my math here is
13  correct totalling up the column Net Holdback.  I
14  want to start over just so we can make sure it is
15  cohesive here.
16          So for the first half of 2013, looking
17  at the first page of Exhibit 64, the total net
18  holdback -- and that's commissions that were not
19  paid to sales representatives on this deal,
20  correct?
21      A.   On that specific deal, yes.
22      Q.   Okay.  So the total commissions that
23  weren't paid was $2,793,575, correct?
24      A.   Correct.
25      Q.   The total commissions that were not paid

Page 45

1   in the second half of 2013 is $8,307,299, correct?
2       A.   Correct.
3       Q.   And the total commissions that were not
4   paid in the first half of 2014 is $4,813,120?
5       A.   Correct.
6           MR. BARNES:  Total commissions on that
7   spreadsheet.
8           MR. LEE:  Right.
9           MR. BARNES:  Right.
10  BY MR. LEE:
11      Q.   Okay.  And then the total commissions on
12  the spreadsheet that were not paid for the second
13  half of 2014 is $4,930,931, correct?
14      A.   Correct.
15      Q.   And then the total commissions that were
16  not paid in the first half of 2015 is $20,293,476;
17  is that correct?
18      A.   Correct.
19      Q.   And that was the period that Bobby
20  Choplin's commissions were capped; is that correct?
21      A.   That was where Bobby Choplin's
22  commissions were adjusted.
23      Q.   Okay.  So not capped; that's different?
24      A.   I consider that to be adjust- -- being
25  different.  It's not capped.  It's adjusted.

Richard Martinotti

Page 46

```
1        Q.   Okay.  I want to ask you a little bit
2   more about that later, but let me go through this.
3        A.   Okay.
4        Q.   With this, we got the right period;
5   that's the period that has given rise to this
6   lawsuit, right?
7        MR. BARNES:  For the BB&T deal at
8   least.
9        MR. LEE:  Right.
10  BY THE WITNESS:
11       A.   Right, of which there are three
12  significant transactions in here that are driving
13  that, but BB&T is not the driver of the 20.29 of
14  holdback, if that's what you are asking.
15  BY MR. LEE:
16       Q.   Well, which one of these is the BB&T
17  deal?
18       A.   It's highlighted there.  It's the fourth
19  or fifth one from the bottom.  One, two, three,
20  four, five and the bottom.  Look over to your left.
21       Q.   Oh, I'm sorry.  It actually says "BB&T."
22  Okay.
23       MR. BARNES:  We redacted everything
24  but BB&T, so...
25       MR. LEE:  Got you, got you.  I think I
```

Page 47

```
1   probably just didn't get a color copy or
2   something from my office.  That's all right.
3   Okay.
4        THE WITNESS:  So of the 20.3, 670 or
5   700,000 was attributed to BB&T.
6   BY MR. LEE:
7        Q.   Okay.  And I think that was from two
8   people, right?
9        A.   Yes.
10       Q.   We will go into that more later.
11       So in the second half of 2015, the total
12  commissions that were not paid is $2,230,347,
13  correct?
14       A.   Yes, correct.
15       Q.   And so for that three-year period that's
16  shown on Exhibit 64, the total commissions that IBM
17  elected not to pay is $43,368,748; is that correct?
18       A.   And IBM found issues, anomalies that
19  drove us to hold back 43 million 368.  That's how I
20  would address it.
21       Q.   Okay.
22       A.   Okay.
23       Q.   And I understand that's how you would
24  phrase it, that's the -- you are putting the reason
25  into your response, but the fact remains that IBM
```

Page 48

```
1   elected in its own judgment not to pay these
2   commissions to its sales reps, correct?
3        A.   Correct, because we didn't consider it
4   to be correct commissions to be paid, right.
5        Q.   And the total of that for three years is
6   over $43 million, right?
7        A.   43 million 368, yep.
8        Q.   Okay.  That's a significant amount of
9   money, isn't it?
10       A.   But if you turn around and look at how
11  much we went and actually released, it's much
12  larger.  I would say that compared to what we
13  actually -- net commission or total commission,
14  it's over $100 million probably.
15       Q.   Okay.  Well, that wasn't my question.
16  My question is, is $43 million a significant amount
17  of money to IBM?
18       A.   We are a $100 billion corporation, so 43
19  million -- 43 million to me is significant, but my
20  point is when you say, when you ask me personally
21  is 43 million significant, I say "compared to," and
22  that's why I keep on saying I would go through and
23  say 43 million compared to the total net
24  commissions.  If the total net commissions is 100
25  million or the total commissions was 143 million,
```

Page 49

```
1   then I would say that, yes, we went through and
2   held 43 million but we released still $100 million
3   worth of commissions.  You see what I'm saying?
4        Q.   Well, even under your example, I mean,
5   that's almost a third of the money would be held
6   back.  That's not significant?
7        A.   But what it's also saying is a third of
8   that commissions for whatever reason should not
9   have been generated to begin with.  The IBM
10  management staff through their review determined
11  that there was $43 million worth of commissions in
12  a calculated format that had an anomaly that had an
13  issue: the wrong quota was there, the wrong
14  territory was there, the people that were assigned
15  were not the right people that should have been
16  assigned, the work contribution wasn't there.
17  There is a lot of different reasons.  That's why
18  the account level inspection program was put into
19  play.
20       Q.   Okay.  And you understand you are here
21  testifying on behalf of IBM today?
22       A.   Exactly, and that's why I'm trying to do
23  that distinction.  From an IBM point of view, IBM
24  is going through and looking at, has that
25  inspection program in place to go through and say,
```

Richard Martinotti

Page 50

1   okay, I have a significant transaction. In that
2   significant transaction, all I'm trying to do is to
3   ensure that what is calculated should be released.
4        Not every one of the transactions had a
5   holdback, and so consequently, those were reviewed
6   and were determined to be released, so those were
7   fine. There were others that had some form of an
8   anomaly, and because of that anomaly, there was an
9   adjustment that was made. That's me from an IBM
10  point of view.
11       Q.   Mr. Martinotti, this is going to be a
12  long day if we don't focus on the question that was
13  asked and answer the question.
14       A.   Okay. I'm sorry.
15            MR. LEE: Could you read my question
16  back, please.
17            THE REPORTER: The most previous
18  question was --
19            MR. LEE: Yes.
20            THE REPORTER: -- "Question: Okay.
21  You understand you are here testifying on
22  behalf of IBM today?"
23            MR. BARNES: Which he answered.
24  BY MR. LEE:
25       Q.   And your answer to that is what?

Page 51

1        A.   Yes.
2            MR. BARNES: Read his answer back.
3            MR. LEE: Okay. I would rather move
4   on with the day.
5            MR. BARNES: Okay. He said yes, so...
6            MR. LEE: Okay, and then a lot of
7   other stuff, and what I'm trying to do is,
8   let's focus on answering the question; and I
9   am fine with you explaining your answer as
10  much as you feel necessary, but if you could
11  focus on the question that I've asked you, I
12  would appreciate that.
13  BY MR. LEE:
14       Q.   So, for IBM, what I'm asking you is, is
15  $43 million a significant amount of money to IBM?
16  Yes or no.
17            MR. BARNES: Asked and answered. Go
18  ahead.
19       A.   As I stated, IBM -- from an IBM
20  perspective, we are a hundred billion dollar
21  corporation. Compare 43 million to a hundred
22  billion dollars. It's money, but it's -- it's
23  compared to a hundred billion dollars. That's IBM.
24  BY MR. LEE:
25       Q.   So is that no?

Page 52

1        A.   I would say no.
2        Q.   But you would agree that $43 million is
3   significant to the sales representatives who were
4   involved in these deals, right?
5        A.   Yes.
6        Q.   So the first half of 2015 represents
7   almost half of the commissions held back over these
8   three years. Why is that?
9        A.   Let's see. There are three
10  transactions, four transactions that had
11  significant holdback and to the point where it
12  looks like the entire team was held such that it
13  was determined that the entire team was incorrectly
14  being considered for commissions.
15       Q.   Which deal was that?
16       A.   I -- so there is the 2.3 million against
17  the 3.9, is what I'm looking at; the 4 million
18  against the 4.6 up above, right here. See that?
19       Q.   Okay.
20       A.   And then there is the 6.5 against the
21  13. The only reasons why we would have that
22  significant of a holdback would -- in my
23  recollection would be the fact that there were
24  significant people that were associated originally
25  to the transaction that were removed because they

Page 53

1   were deemed incorrectly assigned or associated, and
2   so it was a false read in the sense of the original
3   commissions.
4        So here is a primary example of why it
5   was important to go through and do the account
6   level inspection. So let's take the 4 million, the
7   4.6 versus the 4.1. There is obviously -- of that,
8   say there were 50 people on that original
9   calculated commission release. It looks like only
10  about two or three people were recognized
11  ultimately to be released and that all the rest of
12  them were -- were held up.
13       And so that's, you know, again my
14  purpose of why I keep on stipulating we are dealing
15  with reviewing the anomalies.
16       Q.   Okay. And are you speaking from a
17  specific memory of these transactions?
18       A.   No. I'm just looking at, you know, the
19  data that's here right now, and my recollection
20  would be that that would be the -- in my
21  estimation, that would be the reason why that's --
22  that's being reflected that way.
23       Q.   Again, and that may or may not be
24  correct?
25       A.   Without my going back and researching,

Richard Martinotti

Page 54

1  yeah, I don't know.
2      Q.   Okay. Mr. Martinotti, what did you do
3  to prepare for today's deposition?
4      A.   I reviewed my archives. I sat down with
5  legal.
6      Q.   You reviewed your archives. What did
7  that include?
8      A.   I was asked to go through and review my
9  archives and pull whatever information I had on
10 this situation, so I did that.
11     Q.   Did you review any document that has not
12 been produced in this litigation?
13     A.   Not to my knowledge, I mean.
14     Q.   Okay. Did you speak with anyone aside
15 from an attorney?
16     A.   No.
17     Q.   Did you speak with any witnesses,
18 Tom Batthany, Haleh Maleki, anyone who would have
19 personal knowledge of interactions with Bobby
20 Choplin?
21     A.   No.
22        MR. BARNES:  And you are talking to
23 prepare, right, not just generally has he ever
24 spoken with them?
25

Page 55

1  BY MR. LEE:
2      Q.   Right, to prepare for today.
3      A.   Oh, I'm -- yeah, correct.
4      Q.   To be ready to answer questions on
5  behalf of IBM, that's what I was referring to.
6      A.   No. I was instructed not to in that
7  sense of the word. I was supposed to keep this
8  confidential and only to myself.
9      Q.   Who instructed you not to?
10        MR. BARNES:  Let's make sure we don't
11 disclose any communications that you've had
12 with counsel, so...
13        THE WITNESS:  Okay. Sorry.
14        MR. BARNES:  If you can answer that
15 question without disclosing attorney-client
16 communications, you can go ahead and answer
17 it. Otherwise I would instruct you not to
18 answer the question.
19        THE WITNESS:  I will leave it at that.
20 BY MR. LEE:
21     Q.   Okay. So is it your response is you
22 cannot answer my question without disclosing or
23 potentially disclosing attorney-client privileged
24 information?
25     A.   Correct.

Page 56

1        MR. LEE:  I'm in a little bit of a
2  pickle here because I don't know -- like I
3  think I could ask who he met with.
4        MR. BARNES:  Oh, yeah. No, I don't
5  disagree with that. I just --
6        MR. LEE:  I thought that's what I
7  asked. Maybe not.
8        MR. BARNES:  No. You asked him who
9  told you not to...
10        MR. LEE:  Okay. I get it.
11        MR. BARNES:  And so that, I don't want
12 him talking about what he was told by legal,
13 but to the extent he had conversations with
14 other people, then I think you can ask him
15 that.
16 BY MR. LEE:
17     Q.   Okay. Who did you -- you said sat down
18 with legal. Who did you sit down with?
19     A.   Justin.
20     Q.   Okay. I don't think this will come up
21 again, but if it does, I usually understand this,
22 because, of course, there are attorneys who are
23 employees of IBM, right? Is that correct?
24     A.   Correct. I'm --
25     Q.   That's all right.

Page 57

1      A.   Yeah. I'm sorry.
2      Q.   And then I would refer to Justin as
3  outside counsel just for, I don't know, ease of
4  reference. If when you talk about that you met
5  with a lawyer, if it's someone other than outside
6  counsel or somebody at Justin's firm, could you
7  make that distinction for me?
8      A.   I can, and in this case all I did, all I
9  talked with is Justin.
10     Q.   Okay. Did you consider contacting
11 anyone who had personal knowledge of communications
12 with Bobby Choplin to prepare for today?
13     A.   No.
14     Q.   Why not?
15     A.   From past experience in the sense of the
16 past depositions, and the -- you know, it's just I
17 didn't feel like I should.
18     Q.   Okay. Would it be fair to say that
19 without speaking with Bobby's managers, you
20 can't -- you can't be sure of what Bobby Choplin
21 was or was not told orally about his compensation?
22        MR. BARNES:  Hold on, because there
23 are multiple ways --
24        MR. LEE:  Wait. Let's keep it clean.
25 If you are objecting and instructing him not

Richard Martinotti

Page 58

1   to answer --
2       MR. BARNES: Okay. I'm instructing
3   witness not disclose any communications he had
4   with counsel.
5       MR. LEE: Okay. Do you want to read
6   my question back, if you don't mind.
7       THE REPORTER: Question: "Would it be
8   fair to say that without speaking with Bobby's
9   managers, you can't -- you can't be sure of
10  what Bobby Choplin was or was not told orally
11  about his compensation?"
12      THE WITNESS: Try that one again.
13  Sorry.
14      THE REPORTER: Question: "Would it be
15  fair to say that without speaking with Bobby's
16  managers, you can't -- you can't be sure of
17  what Bobby Choplin was or was not told orally
18  about his compensation."
19  BY THE WITNESS:
20      A.  Yeah, but I would consider myself to be
21  secondary.  I mean, wouldn't the -- wouldn't
22  Bobby's statement be relevant between Tom and Bobby
23  and not Bob -- or Tom telling me in hearsay
24  conversation anything in that sense of the word?
25

Page 59

1   BY MR. LEE:
2       Q.  Have you read any deposition transcripts
3   for this case?
4       A.  I read the documents that was given to
5   me from Justin.
6       Q.  Okay.  What documents were those?
7       A.  Just, you know, the --
8       MR. BARNES: I can't answer.
9   BY THE WITNESS:
10      A.  No, I agree, but just the regular
11  document, just the -- the -- the documents that
12  we -- that we found in our archives and you know --
13  you know, stuff that you just provided me here.
14  BY MR. LEE:
15      Q.  So like e-mails --
16      A.  Yes.
17      Q.  -- that kind of thing and education
18  materials that IBM produces?
19      A.  Right.
20      Q.  Is that what you are referring to?
21      A.  Exactly.
22      Q.  Anything other than those two?
23      A.  The -- you know, the -- these documents
24  (indicating).
25      Q.  Okay.  Those are discovery responses?

Page 60

1       A.  Okay.
2       Q.  So that's what you are referring to?
3       A.  Correct.
4       Q.  Okay.  But you have not read Tom
5   Batthany's deposition transcript?
6       A.  No.
7       Q.  And you have not read Haleh Maleki's
8   deposition transcript?
9       A.  Correct, I have not.
10      Q.  And you have not read Bobby Choplin's
11  deposition transcript?
12      A.  Correct, I have not.
13      Or there was a document that Bobby, you
14  know, again, from here had.  I don't know if it was
15  a deposition.  I don't think it was a deposition.
16  It was off of this kind of form, so I read that.
17      Q.  Okay.
18      A.  Okay.
19      Q.  And when you say "that," just for the
20  sake of the record, you are saying, "this kind of
21  form," you are referring to a document that has a
22  caption on it with the case name and the case
23  number?
24      A.  Correct.
25      Q.  Could that have been the complaint in

Page 61

1   this lawsuit?
2       A.  I believe so, yes.
3       Q.  As you sit here today, do you have any
4   knowledge about how Tom Batthany testified
5   regarding what he did or did not speak to Bobby
6   Choplin about?
7       A.  Correct, I do not.
8       Q.  And the same would be true of Haleh
9   Maleki?
10      A.  Correct, I do not.
11      Q.  Do you know Mark Dorsey?
12      A.  Yes, I do.
13      Q.  Have you spoken with him recently?
14      A.  Not recently.
15      Q.  When was the last time you spoke with
16  him?
17      A.  Six months ago.  He is in a different
18  area of the business at this point.
19      Q.  I think he does not work for IBM any
20  more.
21      A.  Right.  I should have put it in that
22  frame.  I'm sorry.
23      Q.  No, that's okay, that's okay.  I just
24  want to make sure we are clear.
25      Aside from Mr. Barnes or anyone at his

Richard Martinotti

Page 62

1  firm, have you spoken with anybody about Bobby
2  Choplin or this lawsuit?
3      A.   No, I have not.
4      Q.   Did you conduct any research?
5      A.   Just going through my archives as asked.
6      Q.   Okay.  All right.  Will you be good for
7  another 30 minutes?
8      A.   I'm fine.
9      Q.   Mr. Martinotti, I'm showing you what was
10  marked as Exhibit No. 2.  This is Bobby Choplin's
11  incentive plan letter for the first half of 2015;
12  is that correct?
13      A.   Yes.
14      Q.   And when we have been referring to the
15  incentive plan letter in our conversations earlier
16  today, this is what we're talking about?
17      A.   Correct.
18      Q.   Now, if you flip to the third page --
19  first, this is the document that includes Bobby
20  Choplin's quota and his territory, right?
21      A.   It has his quota and it has a summary of
22  his territory.
23      Q.   Okay.  So it doesn't include all the
24  information about his territory?
25      A.   It's a summary.  In this document we

Page 63

1  summarize.  He has communicated elsewhere on the
2  specific accounts that he has.
3      Q.   So would it be fair to say that a sales
4  representative couldn't rely on this document alone
5  to include all the information that is relevant to
6  their commissions compensation?
7      A.   No.  This -- this does go through and
8  again in summary format it tells him, you know, his
9  TI, target incentive; his quota; the territory that
10  he is assigned to.  But because if he has 500
11  accounts, we are not putting 500 accounts in this
12  document.  They summarize it as, you know, the
13  Mid-Atlantic East Region territory.
14      Q.   I'm not sure that that answered my
15  question.
16      A.   I'm sorry.
17           MR. LEE:  Could you read my question
18  back, please.
19           THE REPORTER:  Question: "So would it
20  be fair to say that a sales representative
21  couldn't rely on this document alone to
22  include all the information that is relevant
23  to their commissions compensation?"
24           MR. BARNES:  I'm going to object,
25  asked and answered.  Go ahead.

Page 64

1           MR. LEE:  I don't think it was
2  answered.
3           MR. BARNES:  That's fine.  We will
4  deal with that later.
5  BY THE WITNESS:
6      A.   And I would say yes, and I am saying
7  yes.  I -- I expanded by going through and saying
8  this document has all of the information in summary
9  format.  In those circumstances whereby there is a
10  length of accounts, we summarized the territory as
11  here and he has a different location that says here
12  is your 500 accounts.
13  BY MR. LEE:
14      Q.   Well, accelerators are an important part
15  of a sales representative's compensation, aren't
16  they?
17      A.   Um-hmm.  I'm sorry.  Yes.
18      Q.   And accelerators are not included in
19  this document, are they?
20      A.   The sales plan number is included in
21  here.  The sales plan number refers to the sales
22  plan document that will give you further backup and
23  documentation of the specifics of that sales plan
24  and acceleration.
25      Q.   Is that -- the sales plan number is

Page 65

1  where it says "Plan type/name SW409"?
2      A.   Correct.
3      Q.   So you would have to go to another
4  document in order to find that information?
5      A.   Yes.
6      Q.   And if you go to the third page, under
7  General Information, this directs you to your IBM
8  manager to explain the commissions program to a
9  sales representative, doesn't it?
10      A.   Yes.
11      Q.   And that's referring to the first line
12  manager, in this case, Tom Batthany?
13      A.   Correct.
14      Q.   And so there is a link there that you
15  could click on to get some more information about
16  the commissions program, right?
17      A.   Correct.
18      Q.   What would that link take you to?
19      A.   That will take you to an education
20  package for the specific sales plans.
21      Q.   Would you recognize it if you saw it?
22      A.   Yes.
23      Q.   I'm going to give you three different
24  documents that were produced to us that I think
25  will fit that description and ask you to confirm

17 (Pages 62 to 65)

Richard Martinotti

Page 66

1  that.
2      A.   Sure.
3              (Exhibit 65 was marked for
4              identification, as of 10/19/17.)
5  BY MR. LEE:
6      Q.   The first I've marked as Exhibit 65, and
7  on the first page, it's in a PowerPoint style.
8  It's dated January 1st, 2015, and it says "Your
9  2015 Incentive Plan Individual Quota Plan -
10  Employees."
11          MR. BARNES:  What's this?  65?
12          MR. LEE:  65, that's correct.  It
13  starts with Bates stamp IBM 3725.
14              (Exhibit 66 was marked for
15              identification, as of 10/19/17.)
16  BY MR. LEE:
17      Q.   I'm also handing you Exhibit 66,
18  which has the same basic format.  It's entitled
19  "Incentives 101."  It starts on Bates stamp 3655.
20              (Exhibit 67 was marked for
21              identification, as of 10/19/17.)
22  BY MR. LEE:
23      Q.   Finally, I'm showing you what I have
24  marked as Exhibit 67 which is entitled "2015 sales
25  Incentives 1H Incentive Plan Overview - IBM

Page 67

1  Commerce - Software."
2              Are these all true and accurate copies
3  of what they purport to be?
4      A.   I would say yes.
5      Q.   Now, you wouldn't have to click on the
6  link from the IPL to get these documents, would
7  you, as a sales representative at IBM?
8      A.   You are saying -- yeah, you don't have
9  -- you can get to this website in various ways,
10  yes.
11      Q.   Okay, and one of the other ways in this
12  case that we already know about where Bobby Choplin
13  could have accessed this information is from
14  Exhibit 5, the e-mail from Tom Batthany that
15  included a link?
16      A.   Correct.
17      Q.   Okay.  And these three documents should
18  have been accessible from that link to a sales
19  representative like Bobby Choplin and including
20  Bobby Choplin?
21      A.   Correct.
22      Q.   And it would be reasonable for a
23  salesperson like Bobby Choplin to rely on the
24  information in Exhibit 65, 66 and 67 regarding
25  their compensation plan?

Page 68

1      A.   Yes.
2      Q.   Let's look at Exhibit 65 here.  If you
3  look at Page IBM 3733...
4      A.   On the right-hand side are the numbers.
5      Q.   Oh.  I can do that too.  That's fine,
6  Page 9.
7      A.   9.  So this is out of sync with?
8          MR. BARNES:  No.  It's double-sided,
9  so you may --
10          THE WITNESS:  See, so here is 4, 5,
11  then 10, then 8, 9, so it's out of sequence,
12  that's all.
13          MR. LEE:  That's not good.
14          MR. BARNES:  I think mine looks like
15  it's in sequence, so if you want to use this
16  one.
17  BY MR. LEE:
18      Q.   You know, they are not all -- they are
19  in sequence on the Bates pages, so this is -- let's
20  go -- if you'd look at these numbers over here,
21  that's probably the more reliable.  We will be on
22  the same page if we are looking at that.
23      A.   So which one do you want me to be on?
24  9?
25      Q.   3733, IBM 3733.

Page 69

1      A.   33, got it.
2      Q.   So these are -- this is where IBM tells
3  the sales rep the highlights of their commissions
4  plan?
5      A.   Correct.
6      Q.   And there are five bullet points there,
7  correct?
8      A.   Correct.  One, two, three, yep.
9      Q.   One of which is the payout table?
10      A.   Yes.
11      Q.   And it notes, you know, the 1 percent
12  commission for until you hit your quota and then
13  accelerators above that?
14      A.   Correct.
15      Q.   And then the last bullet point is
16  payments uncapped, correct?
17      A.   Correct.
18      Q.   And then the next page -- this is that
19  chart that was included in Exhibit 5.  Or actually,
20  it's two pages over.  The chart that was included
21  in Exhibit 5 is actually what's on Page 3735, isn't
22  it?
23      A.   No, because -- or that's -- yeah,
24  1 point -- yep, yes, it is.
25      Q.   Okay.

Richard Martinotti

Page 70

1      A.   But that says Page 10.
2      Q.   I think I can answer that question for
3  you with another document.  You are looking at the
4  page number on the screen caption that was included
5  in the e-mail in Exhibit 5 that has --
6      A.   Right.
7      Q.   -- a different page number than what's
8  on the salesperson's PowerPoint?
9      A.   Well, yeah.  I mean, if you go through
10  here, it's Page 11.  This is saying Page 10, so
11  it's off of a different --
12      MR. BARNES:  "This" being Exhibit 5?
13      THE WITNESS:  Yeah.  I mean, I believe
14  it is the same document.  It just is sourced
15  from somewhere else, probably.
16  BY MR. LEE:
17      Q.   I want to make sure there is not any
18  confusion among us, so let me show you what I have
19  marked as Exhibit 3.  This is a PowerPoint that
20  managers would use to explain the program to their
21  sales reps, isn't it?
22      A.   Correct.
23      Q.   I suspect if you look at Page 10 there
24  you will see that same chart.
25      A.   No, I get it.  But again, like I said,

Page 71

1  this is Page 11, this is the saying Page 10.  I
2  don't know why.  This is software IOTs, software
3  IOTs, 5, 4, yeah.  This looks like it's the same.
4  I don't know why they have got two different
5  documents here.
6      Q.   Okay.
7      A.   Do you want to take that back?
8      Q.   No.  Keep that in front of you.  We will
9  refer to that in just a little -- actually, let me
10  just make sure I keep these organized for you.
11      MR. BARNES:  Do you want mine back?
12      MR. LEE:  No.
13      MR. BARNES:  I assume you will be
14  using it.
15      MR. LEE:  Yeah.
16  BY MR. LEE:
17      Q.   All right.  So on Page 3735, like we
18  went over before with that screen capture, this is
19  where it says earnings opportunity remains
20  uncapped, right?
21      A.   I agree.
22      Q.   And in the Incentives 101, this is
23  Exhibit 66.
24      A.   66.
25      Q.   And so it's entitled "Incentives 101"

Page 72

1  and I think most of us know what that means, but
2  that, a 101, is like an entry-level course in
3  college, right?
4      A.   Correct.
5      Q.   So this is designed to tell sales
6  representatives that this is the basic information
7  about your plan?
8      A.   Correct.
9      Q.   And then Exhibit 67, this is the more
10  detailed educational material about the
11  compensation plan, right?
12      A.   For that specific individual, yes.
13      Q.   Okay.
14      A.   So, you know, we will have this for each
15  and every one of our brands, yes, and Commerce is
16  just one of them.
17      Q.   And if a sales rep wants to learn more
18  information about their plan, they can click on
19  this link and access Exhibit 67, and this would be
20  the most detailed information they could find about
21  the plan, right?
22      A.   Yes.
23      Q.   And actually, Exhibit 67 includes both
24  the first half 2015 as well as the second half
25  overview, and just for the sake of the record --

Page 73

1      A.   Oh.  It's buried, so it's --
2      Q.   Yeah.  The first half starts on IBM 3572
3  and the second half of the plan starts on 3602.
4      A.   Yeah.
5      Q.   Is that correct?
6      A.   Correct.
7      Q.   Can you show me where in Exhibit 67 or
8  66 or 65 this significant transactions review or
9  something like it is discussed?
10      A.   It's not in any of these sales plans.
11  It's only in the incentive of the IPL that I'm
12  aware of, significant transaction statement.
13      Q.   Why not?
14      A.   I mean, the significant -- the IPL
15  disclaimer, it's a disclaimer.  This, each of the
16  other packages are talking to here is your
17  incentives, here is what you're being focused on,
18  this is what we are looking to have you focus for
19  this sales plan period, and based on that focus,
20  you will be compensated in the following fashion,
21  you know, be it an IQP, which is high leveraged
22  sales plan versus absolute sales plan versus a
23  bonus plan versus whatever, you know.
24      And in the IPL, the IPL specifically
25  talks to here is your sales plan information, that

19 (Pages 70 to 73)

Richard Martinotti

Page 74

1  being your target incentive, your base salary, your
2  specific sales plan itself, in this case the 40 --
3  the SW409 and then the specific disclaimers.
4       It is this IPL that we go through and
5  require our each and every sales individual to
6  review and to sign. We don't -- we don't ask that
7  of the salespeople for the education. The
8  education is for their, you know, purposes. They
9  can read it if they want; they can ignore it if
10  they want. They cannot ignore the IPL, so the IPL
11  is where we have the disclaimers.
12       Q.   Why do you say they can't ignore the
13  IPL?
14       A.   Because they have to sign this IPL.
15  For them to go through, for the salesperson to
16  establish his, you know, assignment within IBM for
17  that sales plan, he has to sign this IPL on the FMS
18  system, he has to accept it; and by accepting it,
19  he is accepting the information that's in this
20  document, and what this does is it sets up the
21  territory information within the FMS system.
22       Q.   But you can't confirm whether any sales
23  representative has read these disclaimers, can you?
24       A.   I mean, it -- for the -- for the
25  sales -- the salesperson is instructed to read and

Page 75

1  to -- and to accept. I can lead a horse to water.
2  Can I have the horse drink it? I can't do that.
3       Q.   Do you know whether it's common practice
4  for sales reps and even managers not to read these
5  IPLs when they accept them?
6       A.   I would just say for myself I would want
7  to go through. I read, you know, all of these
8  types of situations on my credit cards and on my --
9  you know. So, I consider this to be part of the --
10  you know, if I'm signing it, I'm reading it.
11  That's me personally.
12       Q.   I think I see you've got an iPhone over
13  there. Is that right?
14       A.   That's an Android.
15       Q.   It's an Android, okay.
16       A.   Yeah.
17       Q.   Have you ever downloaded an update to an
18  app?
19       A.   I have, and I've read them.
20       Q.   You read the software licensing
21  agreement?
22       A.   I do read the software, because to be
23  perfectly blunt, there are -- you know, I am a
24  privacy nut. I don't like, you know, Big Brother,
25  you know, looking over my shoulder, knowing exactly

Page 76

1  where I am at any given time. If they share, if it
2  specifically states that they share it, I don't
3  take the app. You know, those types of situations.
4  So, yes, I do read them personally.
5       Q.   Do you do that for your operating
6  system?
7       A.   I do that for my operating system
8  because I have to go through; and understand again,
9  you know, Microsoft, just like -- you know,
10  Microsoft is a primary example. You know, I just
11  love it, especially Windows 8 -- or Windows 10, I
12  should say. Now with Katrina, you know, that --
13  talk about an expansion of privacy or lack of.
14       Microsoft has the ability to go through
15  and to -- if you go through the Katina [as
16  pronounced] process, that will go through and
17  download every, you know, keystroke that you make,
18  and they are keeping tabs of it. I personally do
19  not -- I turned off Katina from the Windows 10
20  personal that I have.
21       Q.   Is that something that virtually
22  everyone does, to your knowledge?
23       A.   No.
24       Q.   Why not?
25       A.   Because, you know, they have different

Page 77

1  opinions, different approaches.
2       Q.   But if they'd read it, wouldn't they?
3       A.   Well, I mean, you know, others -- you
4  know, I look at my nieces and my nephews, the
5  Millennials. They like it. You know, they like,
6  you know, going through and having, you know, the
7  system keep tabs of it because they feel that it
8  saves them time. I don't mind going back and
9  looking at, you know, my past purchases. I don't
10  need a machine to tell me what my past purchases
11  were.
12       Q.   Okay. But you recognize that you are
13  the exception?
14       A.   I might be an anomaly, but that's me
15  personally. You asked me, so...
16       Q.   Right.
17       A.   Yeah.
18       Q.   You would agree that the language here
19  is -- this is legal language, right? Here in this
20  IPL under "Other Important Information," what
21  follows is legal language, right?
22       MR. BARNES: I'm going to object to
23  the extent it calls for a legal conclusion,
24  but...
25

Richard Martinotti

Page 78

BY MR. LEE:
1
2    Q.   You can answer.
3    A.   I -- I wouldn't -- I don't know if by
4 legal -- are you saying is it complex?  To me, it's
5 a very straightforward.  It talks to -- you know,
6 an incentive plan talks to the rights to modify; it
7 talks to, you know, adjustments for errors and it
8 explains, you know, in each of those sections.  I
9 don't think it's legalese in each of those
10 sections, but that's me personally.
11    Q.   Okay.  Well, how about IBM?  Well, who
12 drafted it?
13    A.   You know, HR and our lawyers, you know,
14 would have drafted, you know, all of our, you know,
15 sales plans.  They would have reviewed them.
16    Q.   Drafted or reviewed?
17    A.   They would have -- they would have --
18 personally, I believe they review them.  I don't
19 believe they physically draft them.  But, you know,
20 I'm not close enough to be able to really tell you
21 definitively one way or the other.
22    Q.   I mean, IBM has a team of lawyers that
23 would review this information and draft it and
24 develop these incentive plan letters, right?
25        MR. BARNES:  Asked and answered.

Page 79

BY THE WITNESS:
1
2    A.   The answer is yes.
3 BY MR. LEE:
4    Q.   And you would agree with me of course,
5 that this significant transaction process has been
6 a surprise to some sales reps, right?
7        MR. BARNES:  Asked and answered.
8    A.   I don't think of it as a surprise.  I
9 mean, it's -- it's -- it's in their -- it's in
10 their IPL.
11    Q.   That's not my question.
12    A.   Okay.
13    Q.   You are aware that some sales
14 representatives have been surprised to learn that
15 IBM claims the right to review significant
16 transactions, wouldn't you?
17    A.   No.  I don't -- they have been confused
18 and after we go through, after I've had
19 conversations with them, because I think that's
20 where -- I believe that's where you are referring
21 to.  In my conversations, my personal conversations
22 with them, you know, I would go through and, you
23 know, highlight the fact that this is what IBM is
24 doing and they understand it at that point.
25    Q.   Okay.  So you would agree that this

Page 80

significant transaction review has been the source
1
2 of some confusion?
3    A.   Has been the source of questions.
4    Q.   Okay.  You said confused.  You said
5 sales representatives were confused and they came
6 and talked to you and you helped them understand
7 it.
8    A.   Confused.
9    Q.   So I guess I'm just going to -- not
10 understanding.  Would you agree that the
11 significant transactions review that you had to
12 explain to these representatives was the source of
13 some confusion?
14        MR. BARNES:  Asked and answered.
15 BY MR. LEE:
16    Q.   You can answer.
17    A.   Yes.
18    Q.   But you would also agree that IBM has
19 not made any efforts to resolve that confusion by
20 the materials in Exhibit 65, 66 or 67?
21    A.   I don't think it has to, because
22 again --
23    Q.   Not my question.
24        MR. BARNES:  Let him finish his
25 answer.

Page 81

BY MR. LEE:
1
2    Q.   Please answer my question and then you
3 can explain.
4        MR. BARNES:  Let him finish his
5 answer, and then if you have a followup
6 question, you can ask.
7 BY MR. LEE:
8    Q.   You can answer.
9    A.   Again, I don't consider these documents
10 requiring the disclaimers.  The IPL is where the
11 disclaimers should be and are because the IPL is
12 where you have to sign and accept.
13        I am not asking an employee to review
14 and accept that they reviewed the education
15 package.  So, is the education package a vehicle
16 for communications?  Yes.  However, it is not a
17 vehicle that I am requiring them to document that
18 they did read.  I am requiring them to read and
19 document and accept the IPL.
20        MR. LEE:  Okay.  Could you read back
21 my question, please, because I didn't get an
22 answer to it.
23        THE REPORTER:  Question: "But you
24 would also agree that IBM has not made any
25 efforts to resolve that confusion by the

Richard Martinotti

Page 82

1  materials in Exhibit 65, 66 or 67?"
2       MR. BARNES:  Asked and answered.
3       MR. LEE:  It was not answered.
4       MR. BARNES:  We can argue about that
5  later.
6       MR. LEE:  I agree.
7  BY THE WITNESS:
8       A.  I still say that I don't believe it's a
9  requirement for IBM to go through and clarify
10  anything in the education packages.
11  BY MR. LEE:
12       Q.  That's not my question.
13       A.  So, the answer is no.
14       Q.  No, you would not agree that IBM has not
15  made any efforts to resolve the confusion in
16  Exhibits 65, 66 and 67?
17       A.  No, I don't.  I believe that IBM doesn't
18  need to make any effort to go through and update
19  these three documents.
20       Q.  Let me make sure that I understand your
21  testimony.  What you are telling me is IBM has not
22  made an effort to resolve the confusion about
23  significant transactions in the education packet
24  because you don't believe that IBM has an
25  obligation to do that?

Page 83

1       A.  I believe that IBM has answered that
2  through the IPL.  That's where the documentation,
3  in my opinion, belongs and it is, because that is what
4  IBM requires the employee to sign.
5       The IBM is -- IBM is not looking -- IBM
6  is using the three documents here as education,
7  okay?  But, you know, again, in the -- does, you
8  know, our -- is this document updated?  Yes.  It's
9  changed and --
10       Q.  You are looking, you are referring to
11  Exhibit 67?
12       A.  I'm sorry.  Yes.
13       And we say it in -- in the education
14  material that you should always be going back to
15  the most current view of the document.
16       Q.  Of the document?
17       A.  Of these education documents.
18       Q.  Okay.  And this is dated January 2015?
19       A.  Yeah.
20       Q.  So this is the most current as of the
21  time that the BB&T deal was in process, right?
22       A.  I agree, yeah.
23       Q.  And my question is that IBM has not
24  attempted to resolve the confusion about
25  significant transactions in the education

Page 84

1  materials; is that correct?
2       MR. BARNES:  Asked and answered.  Go
3  ahead.
4  BY THE WITNESS:
5       A.  I think it has.  I mean, you know, I
6  think it -- it -- it has.  I'm just going to say it
7  has.
8  BY MR. LEE:
9       Q.  Show me where.
10       A.  My point is, I consider the disclaimers
11  to be relevant for the IPL, and the education
12  information that goes and talks to here is your
13  sales plan opportunity, capability, is what's in
14  the education package.
15       Q.  I understand.  You are telling me that
16  the significant transaction policy is included in
17  the IPL, correct?
18       A.  Yes.
19       Q.  What I'm asking you is, is it included
20  or explained or referenced in the education
21  materials?
22       MR. BARNES:  Asked and answered.
23       A.  The answer is no, and I have said that
24  before, yeah.
25       Q.  Okay.  And so by that, you would agree

Page 85

1  that IBM hasn't made an effort to resolve any
2  confusion about the significant transaction policy
3  by these education materials, right?
4       MR. BARNES:  Asked and answered.
5       A.  They haven't done anything in the
6  education packages, correct.
7       Q.  And anywhere outside of the IPL, right?
8       A.  I have conversations.
9       Q.  And you don't have any evidence that any
10  such conversations took place with Bobby Choplin,
11  do you?
12       MR. BARNES:  Objection.
13       A.  I don't personally, correct.
14       Q.  Well, you are here on behalf of IBM.
15       A.  You know, the first line manager, second
16  line manager all know the disclaimers.  They should
17  be going through and explaining that information.
18  Do I know personally?  Did I verify that each and
19  every manager did?  No.
20       Q.  Bobby Choplin's explained that no one
21  talked to him about that, and you don't have any
22  basis to disagree with that, do you?
23       MR. BARNES:  Objection,
24  mischaracterizes Bobby Choplin's testimony.
25

Richard Martinotti

## Page 86

BY MR. LEE:

Q.   You can answer.

MR. LEE:  No, it doesn't.

A.   I can't answer it one way or the other.

Q.   Well, my question is whether you have any evidence to dispute it.

A.   Personally and as IBM, no.  You know, I have to go back to Tom and his deposition.

Q.   And the purpose of today was for me to be able to ask questions about IBM's position, and you understand you had an obligation to be prepared to talk about that, right?

MR. BARNES:  Objection.

BY MR. LEE:

Q.   You can answer.

A.   I don't need to.

Q.   You do.

A.   Oh, do I?

Q.   Yes.

A.   I was prepared based on the information that I thought was necessary.  I did not speak with Tom.

Q.   One of the topics that we had asked you to give information about were representations IBM made to Bobby Choplin about the sales commissions

## Page 87

program; wouldn't you agree?

A.   Yeah.

Q.   Okay.  But you did not make any effort to discuss what representations either Haleh Maleki or Tom Batthany made to Bobby Choplin about his sales commissions before today, have you?

MR. BARNES:  Do not disclose any communications with counsel in answering the question.

A.   And I'm saying I did not talk to Tom.

Q.   And I'm asking what efforts you made, not what conversations you had with Mr. Barnes.

A.   But that's my point.  I as the IBM representative, I did not go to Tom.

Q.   Okay.  I would like to show you another series of exhibits.

MR. BARNES:  Could we take a break whenever is good for you?

MR. LEE:  Now is good.

THE VIDEOGRAPHER:  Going off the record at 10:45 a.m.

(Recess taken, 10:45 - 10:54 a.m.)

THE VIDEOGRAPHER:  Beginning Disk 2. We are back on the record at 10:54 a.m.

(Exhibits 68 and 69 were marked for

## Page 88

identification, as of 10/19/17.)

BY MR. LEE:

Q.   All right, Mr. Martinotti.  I'm going to show you a series of exhibits here.

A.   Okay.

Q.   First what I have marked as Exhibit 68, second what I have as Exhibit 69, and then third, what we have previously marked as Exhibit 3, which we have discussed briefly already today.

So we talked earlier about some materials that managers are given to help them explain the compensation plan and commission structure to their sales reps.  Are these three exhibits, 68, 69 and Exhibit 3, the materials that managers are given in order to do that?

A.   Yes.

Q.   Exhibit 68 was what was given to managers like Tom Batthany in 2013 -- strike that.

Exhibit 68 was the material given to Tom Batthany in 2013; Exhibit 69 is the material given to Bobby's manager in 2014; and Exhibit 3 is the material given to Tom Batthany in 2015; right?

A.   Correct.

Q.   And as with the other educational materials we discussed, these don't say anything

## Page 89

about the significant transaction reviewed today?

A.   They do not.

Q.   They don't attempt to explain it or provide any education for managers for how they should explain it to sales reps, right?

A.   Correct.  That's not in here.

Q.   And what these do include, as with the sales rep materials, they include the same references to payments uncapped and earnings opportunity remains uncapped, correct?

A.   Correct.

Q.   Each of these three do that, don't they?

A.   Yes, they do.

(Exhibit 70 was marked for identification, as of 10/19/17.)

BY MR. LEE:

Q.   I'm also showing you a copy of what I have marked as Exhibit 70.  This is a PowerPoint program for 2015 that is designed to assist managers in understanding the incentive plan and explaining it to sales representatives, correct?

A.   Correct.

Q.   Okay.  So this is just another part of the materials that we went over just a moment ago, Exhibit 68, 69 and Exhibit 3.  You would look at

23  (Pages 86 to 89)

Richard Martinotti

Page 90

1  Exhibit 70 as well, and that would form all of the
2  materials that managers are given to help them
3  explain the compensation plan to sales reps?
4      A.  Correct.
5      Q.  And can you point anywhere on Exhibit 70
6  where it discusses the significant transactions
7  review policy or it gives any guidance for the
8  manager on how to explain that to their sales rep?
9      A.  Well, if you go to Page 676, it talks to
10  the review processes and the review statements.
11      Q.  676?  Where is that?
12      A.  So, you know, as we are going through
13  and assessing individuals, there is review
14  incentive statements, there is review, the data
15  assessed for the performance and incremental
16  incentives.
17      Q.  Can you tell me -- these have numbers on
18  them.  Would you --
19      A.  Oh, I'm sorry.  13 and 17.  Those are
20  review situations, reviews, setup, review and
21  approve -- oh, that's pools.
22      Q.  So 13 and 17?
23      A.  Let's just strike this.  This whole page
24  is the pool, so it wouldn't be relevant to the --
25  to the high leverage sales plan.

Page 91

1      So, on Page 360 -- or 380, you know, the
2  first bullet highlights, "For incentive function,
3  the sales manager is required to review their
4  employee's earnings.  That can be done by reviewing
5  their incentive statements for Cognos earnings
6  reports," and they are reviewing for reasonable
7  accuracy, you know, so the next bullet talks to,
8  you know, what you are reviewing.
9      Q.  But that doesn't have anything to do
10  with how they talk to their sales reps and explain
11  the compensation plan, does it?
12      A.  No.  This is just -- again, what you are
13  asking, this, in this document 70 is instructions
14  for the managers.
15      Q.  Okay.
16      A.  And so in the instruction for the
17  managers this page talks to, you know, you should
18  be reviewing and assessing.
19      Q.  But it doesn't say you should talk to
20  your sales representatives about this process and
21  how you are going to review and what you are going
22  to review or anything like that, does it?
23      A.  No, it does not.
24      Q.  So you would agree that Exhibit 70
25  doesn't provide any guidance for managers on

Page 92

1  whether or how they should discuss the large
2  transaction or significant transaction review
3  process with sales reps?
4      A.  Correct, it doesn't.
5      Q.  You are aware that the complaint in this
6  action references a 2015 sales kickoff meeting, are
7  you not?
8      A.  Yes.
9      Q.  And are you prepared to discuss that
10  meeting today?
11      A.  I believe so, yes.
12      Q.  What is a sales kickoff meeting?
13      A.  It's a rally, so to speak, to get the
14  sales organization motivated and up to speed on
15  the, you know, the current focus; the current, you
16  know, business priorities.
17      Q.  Okay.  And part of what's discussed at
18  those sales kickoff meetings is the compensation
19  plan for the coming period, right?
20      A.  Correct.
21      Q.  And is part of the goal with discussing
22  compensation plan to motivate the sales reps to go
23  out and sell as much as they can?
24      A.  Yes.
25      Q.  And an effective way to do that is to

Page 93

1  have sales representatives understand that they can
2  make a lot of money, right?
3      A.  Yes.
4      Q.  And at this first half of 2015 kickoff
5  meeting, that was done, wasn't it?
6      A.  Yes.
7      Q.  Sales representatives were told that
8  they could make a lot of money under this
9  compensation plan, correct?
10      A.  Yes.
11      Q.  Were sales representatives also told at
12  that meeting that their earnings opportunity was
13  uncapped?
14      A.  Yes.
15          (Exhibit 71 was marked for
16          identification, as of 10/19/17.)
17  BY MR. LEE:
18      Q.  I will show you what I have marked as
19  Exhibit 71.  The next three exhibits I'm going to
20  show you are PowerPoints that were produced to us
21  by IBM that I think were used at that meeting,
22  okay, just to give you some context.
23          Have you seen this before?
24      A.  Yes, I have.
25      Q.  And is this a true and accurate copy of

Richard Martinotti

Page 94

1    a PowerPoint that was presented at the 2015 first
2    half sales kickoff meeting?
3        A.   To the best of my recollection, yes.
4        Q.   And like we discussed, the very first
5    slide after the introduction page on Exhibit 71 is
6    a pile of money?
7        A.   Yes.
8        Q.   That's telling the sales reps they can
9    make a lot of money --
10       A.   Right.
11       Q.   -- correct, under this compensation
12   plan, right?
13       A.   Under the -- yes, under the high
14   leverage sales plan.
15       Q.   Okay.  And then the next page talks
16   about Software as a Service, SaaS?
17       A.   SaaS, correct.
18       Q.   And the elements of -- strike that --
19   the accelerators for SaaS sales, correct?
20       A.   Correct.
21           (Exhibit 72 was marked for
22            identification, as of 10/19/17.)
23   BY MR. LEE:
24       Q.   Next I'm showing you Exhibit 72.  Is
25   this a true and accurate copy of a PowerPoint that

Page 95

1    was presented at the first half of 2015 sales
2    kickoff meeting?
3        A.   Yes, I believe so.
4        Q.   And here if you look at Page IBM 4033.
5            Well, first, this presentation was
6    called "Why does it pay to care?"
7        A.   Right.
8        Q.   So this presentation was designed to
9    tell sales representatives if they focus on sales
10   this period, they can get paid a lot of money?
11       A.   Correct.
12       Q.   And it talks about the accelerators and
13   as they relate to SaaS once again on IBM 4033,
14   correct?
15       A.   So where is 4033?  It's further back.
16   Yes.
17       Q.   And the sales reps at that meeting were
18   told they could make a million dollars, weren't
19   they?
20       A.   Yeah.
21       Q.   Do you know who said that?
22       A.   I don't recall offhand.  I think it's
23   Rohrer or Janet.  No, I don't recall.
24       Q.   Did any sales rep at IBM make a million
25   dollars, any sales rep who was at that meeting or

Page 96

1    could have been at that meeting make a million
2    dollars in 2015?
3        A.   In 2015 versus 2014?  I mean, I would
4    have to go back and look.  The answer would be yes,
5    I know that people did in 2015 earn over a million
6    dollars.
7        Q.   Do you know who?
8        A.   I would have to go and query the system,
9    the incentive system.
10       Q.   Okay.  Would that be difficult to do?
11       A.   It's probably in archives at this point,
12   so it will take us time.
13       Q.   Would you take me through the process.
14   What would you do to go through and find that
15   information?
16       A.   We tend to go through and keep --
17   because of the volume of the records, we tend to go
18   and keep only the current year plus one on our, you
19   know, direct systems, our productive systems, and
20   then anything past is put into archives; and what
21   that would mean is all that's on tape, it's on
22   storage.
23       Q.   Okay.
24       A.   And we would have to go and pull those
25   records, load them onto our system and then be able

Page 97

1    to query the data, but that's the process.
2        Q.   How long do you think that would take?
3        A.   Probably a couple of weeks.  We would
4    have to find everything, all the data, and then,
5    you know, be able to schedule the run and, you
6    know, that type of situation.
7        Q.   Is that something that IBM does
8    regularly, is search its archives for information?
9        A.   We don't necessarily -- I mean, we tend
10   not to have to go to our archives that I'm aware
11   of.  You know, our need is normally simply the
12   current year plus one, so that's why it's, you
13   know, that's -- you know, that's why we have that
14   on our systems.
15       Q.   How do you -- would you agree that you
16   are speculating to a degree that someone made a
17   million dollars in 2015?
18       A.   I've heard that we've had people over a
19   million dollars, yes.
20       Q.   Okay.  Who did you hear that from?
21       A.   Just because of my being part of the
22   compensation, you know, organization.
23       Q.   Okay.  And that just strikes a
24   familiar --
25       A.   Yeah.

Richard Martinotti

Page 98

1    Q.  -- chord in your brain that you heard
2  that at some point that somebody made a million
3  dollars?
4    A.  Yes.
5    Q.  Is that something that's like
6  celebrated?  Is there a specific award or something
7  like that?
8    A.  Yeah.  I mean, people, you know, make
9  note of it and, you know, we've gone through and,
10  you know, you've got different awards and, you
11  know, different recognition.
12    Q.  Okay, okay.
13       (Exhibit 73 was marked for
14       identification, as of 10/19/17.)
15  BY MR. LEE:
16    Q.  I'm going to show you what I have marked
17  as Exhibit 73.  Is this a true and accurate copy of
18  a PowerPoint that was presented at the 2015 first
19  half sales kickoff meeting?
20    A.  I believe so, yes.
21    Q.  This again is part of the "Why does it
22  pay to care?", again trying to motivate sales reps
23  as much as possible by telling them they can make
24  as much money as their sales warrant, right?
25    A.  Correct.  Where the business is, where

Page 99

1  the business has been, that type of, yes.
2    Q.  Okay.  And then if you look at
3  Page 3991, it says, the title of this is, "Why you
4  should care.  Payments is different."  It says, "I
5  will bring you the deals," and it's citing I think
6  five different deals there, all multimillion, as
7  high as 30 million.  Is that correct?
8    A.  Correct.
9    Q.  And then under the bullet point below
10  all those multimillion dollar deals it says, "We
11  have targets for upgrades that we can't get to,"
12  and in parentheses, what does it say there?
13    A.  "Yes, you get paid."
14    Q.  And the next bullet point says, "We have
15  a 108 million TCV pipeline for IPS that we need
16  help closing for 2015."  And what does it say in
17  the parentheses?
18    A.  "Yes, you get paid."
19    Q.  Is there anything in any of these
20  PowerPoint presentations or was there anything
21  discussed at the 2015 kickoff meeting about IBM's
22  policy of reviewing significant transactions or
23  large deals?
24    A.  No.
25    Q.  All right.  I want to talk to you about

Page 100

1  the BB&T deal and the process of IBM's review of
2  the commissions that should be paid on that deal.
3  Okay?
4    A.  Okay.
5    Q.  So as I understand it, the BB&T deal
6  closed at the very end of the first half of 2015.
7  I think it may have even been on June 30th.  Is
8  that your understanding?
9    A.  Yes.
10    Q.  So all of the commissions for that deal
11  were processed in the first half of 2015, correct?
12    A.  They were dated the first half of 2015.
13  They were physically processed in August and
14  September, but yes.
15    Q.  I think I understand that distinction,
16  but I want to be clear that those commissions
17  applied to the first half of 2015 IPL or
18  commissions program, right?
19    A.  Yes, yes.
20       (Exhibit 74 was marked for
21       identification, as of 10/19/17.)
22  BY MR. LEE:
23    Q.  I'm showing you what I have marked as
24  Exhibit 74.  This is an e-mail you sent to a bunch
25  of people at IBM on July 10th, 2015; is that

Page 101

1  correct?
2    A.  Correct.
3    Q.  Is this a true and accurate copy of that
4  e-mail?
5    A.  Yes.
6    Q.  And you've seen this before?
7    A.  Yes.
8    Q.  Is some of the language here language
9  that you use commonly on these kinds of reviews?
10  Like to me, it looked like the first paragraph may
11  be something that you have used before; is that
12  correct?
13    A.  Yes.
14    Q.  Okay.  Where does this e-mail begin with
15  language that applies specifically to this deal and
16  this review?  Does that make sense?
17    A.  But it says right at the very beginning,
18  "Part of our continued responsibility as senior
19  managers is to coordinate the high attainment
20  management review process within our region/geo."
21  That's what this says.
22    Q.  I think my question was confusing.
23    A.  And it's -- and it's -- and it's -- the
24  subject is the management inspection package, so
25  it's the accounting management inspection, so it

Richard Martinotti

Page 102

1  refers to the fact that it is the account level
2  management inspection.
3      Q.  I think my question was confusing.
4      A.  Okay.
5      Q.  I know there are things in my job that
6  I do a lot and that apply to a lot of different
7  cases, and then I will edit those to apply to a
8  specific case.
9          It struck me as this e-mail may be an
10 e-mail that you sent when you begin a review of a
11 large deal and then you edit the same language to
12 apply to the specific deal that you are reviewing;
13 is that correct?
14     A.  Correct.  This is kind of -- I use this
15 as a boilerplate for the account level inspection
16 and then insert on the second page the spreadsheet
17 and the relative information of the specific
18 account that we're -- that I'm asking to be
19 reviewed.
20     Q.  Okay.  So, it looks to me as though the
21 boilerplate language starts at the beginning and is
22 boilerplate for the whole first page and continues
23 down to the line that says, "The E/R proposed
24 compensation release for this package is," and then
25 the first unique information is that chart on the

Page 103

1  second page.  Is that correct?
2      A.  Correct.
3      Q.  And then you insert the ER percentage
4  range for this deal, correct?
5      A.  Correct.
6      Q.  And then the next language is
7  boilerplate.  With the line beginning "In this
8  case," that's unique to this review, correct?
9      A.  Correct.
10     Q.  And then after that sentence, the
11 remainder of the e-mail is boilerplate, right?
12     A.  Correct.
13     Q.  What is E/R?
14     A.  Expense to revenue.
15     Q.  Okay.  So that's -- is that a budget
16 that's set with every deal?
17     A.  No.  It's just a -- what we use as a
18 guideline as to how much expense we expect out of a
19 commission package.
20     Q.  When is that set?
21     A.  It's not set.  It's -- it's a guideline
22 that we use internally.  We used in North America
23 as a starting point what we consider to be, you
24 know, an average or a rule stick for our management
25 team as a guideline.  We, Scott, myself and at that

Page 104

1  point John Dunderdale put that together.
2      Q.  What is the average guideline in North
3  America for deals you review?
4      A.  As I said, it starts with 10 percent,
5  and it can go anywhere above 10 percent or less
6  than 10 percent, but we use 10 percent as our
7  starting point.
8      Q.  Okay.  And that's where it stayed with
9  the BB&T deal, right?
10     A.  Actually, if I go back to our
11 spreadsheet...
12     Q.  You know, I don't want to make you dig.
13     A.  It's right here.
14     Q.  Oh, yeah.  Okay.
15     A.  Oh, actually, I have to take that back.
16 It's right here.  No.  That's prior to us
17 adjusting.
18         So, we adjusted it to an E/R of 9.93, so
19 it's just slightly under 10 percent.
20     Q.  So you could have left it at 13.34
21 percent but decided to adjust down to just under
22 10 percent?
23     A.  The management team found anomalies, and
24 so with that, they adjust it.
25     Q.  Okay.  And who made the decision that

Page 105

1  the E/R percentage should be in the range of 10
2  percent?
3      A.  As I mentioned earlier, it was myself,
4  Scott and John Dunderdale.
5      Q.  Okay.
6      A.  We did that as a rule stick.  It's just
7  a starting point.
8      Q.  Okay.  So this was an established
9  practice before you sent this e-mail?
10     A.  Correct.
11     Q.  And so that's a starting point.  You go
12 through and review, and like you said, it could be
13 higher or lower, but you are starting with every
14 deal at 10 percent?
15     A.  We are starting, yes, and that's part of
16 the boilerplate.  But as you recognize in the
17 spreadsheet, you will see that we have a number of
18 spread -- of transactions that even start below 10
19 percent.  So, again, it's a guide.
20     Q.  All right.  Let's go to the first page.
21 Part of the boilerplate language reads, "As has
22 always been the case, the process is not intended
23 to cap, but rather ensure that payments are
24 commensurate with the contribution of the rep and
25 that there are no anomalies in quota or territory

Richard Martinotti

Page 106

1  that could have caused an inappropriate payment
2  and/or result in recoveries after the fact."
3       Did I read that correctly?
4    A.  Correct.
5    Q.  Okay.  So, you said earlier -- you
6  corrected me when I used the term "cap," that this
7  is not a cap, it's an adjustment; right?
8    A.  Correct.
9    Q.  What's the difference?
10   A.  The capping to me is I'm just
11 arbitrarily going through and putting somebody at
12 500,000 versus 600,000.  Adjusting, I'm going
13 through and identifying some anomaly within that
14 territory within that setup, within that revenue
15 recognition that I needed to correct.
16      As I pointed out or as I highlighted in
17 our earlier, you know, review of the spreadsheets
18 and when we saw the 20 million in the 2015, you
19 know, half of them were off of four transactions,
20 that we adjusted the entire, you know, E to R or
21 the entire package.  That highlights the fact that
22 there are times that anomalies creep into the
23 process and need to be corrected, and that's what
24 this is referring to.
25   Q.  Okay.  So the reason you feel like this

Page 107

1  is not a cap but an adjustment is because it
2  happens to specific deals, not the overall revenue
3  that a sales representative is working?
4    A.  Correct.
5    Q.  Okay.  Because you would agree that IBM
6  doesn't have the right to cap a sales rep's
7  commissions, right?
8    A.  Correct.
9    Q.  But IBM does have the right to adjust a
10 sales rep's commission; that's IBM's position,
11 right?
12   A.  IBM has -- in the disclaimer, IBM has
13 the right to review and adjust, yes.
14   Q.  And as long as IBM's adjustments are to
15 a specific deal and not all deals, IBM's position
16 is that's not a cap; is that fair to say?
17   A.  Yeah.
18   Q.  Okay.  Is that defined anywhere in the
19 materials, in the IPL and educational materials, in
20 the manager's materials, anything, the difference
21 between cap and adjust?
22   A.  I'm trying to think.  I mean, there is
23 not a glossary or a definition that says here is
24 capping, here is the definition of an adjustment,
25 no, outside of the fact that the IPLs specifically,

Page 108

1  you know, in the disclaimer talks to here is what
2  they -- here is what we refer to as a significant
3  transaction.
4    Q.  Have you had anyone at IBM come to you
5  after an adjustment and say, you know, "IBM capped
6  me on this deal"?
7    A.  And I would go back to them and say that
8  they didn't cap you; they adjusted you.
9    Q.  Okay.  So, first, let me -- that has
10 happened?
11   A.  Yes.
12   Q.  Okay.  So would you agree there is some
13 confusion about the difference between a cap and an
14 adjustment of commissions?
15   A.  The answer is yes, there is confusion
16 or, said differently, they use the term
17 interchangeably incorrectly.
18   Q.  Who is "they"?
19   A.  The salespeople.
20   Q.  Okay, okay.  You think -- and managers
21 too, right?
22   A.  Right.  Every adjustment they consider
23 to be a cap, and that's not -- you know, a cap is
24 not an adjustment and an adjustment is not a cap.
25   Q.  Okay.  And you personally try to explain

Page 109

1  the difference to people when they ask, right?
2    A.  Yes.
3    Q.  But IBM doesn't try to explain the
4  difference to people as a part of their policy, do
5  they?
6    A.  IBM through the sales -- the management
7  team does.
8    Q.  What evidence do you have of that?
9    A.  We've gone -- you know, our senior
10 leadership goes through and sends out, you know,
11 communiques reminding the management team of
12 inspection programs and things of that nature, and
13 that, to me, is going through and reminding, you
14 know, the managers their role of responsibility.
15   Q.  Okay.  Do they ever used word "cap" in
16 those materials?
17   A.  No.
18   Q.  Have you read Tom Batthany's e-mails
19 after the BB&T commissions were reviewed?
20   A.  Yes.
21   Q.  Did you see that he considered what had
22 happened to be a cap of Bobby's commissions?
23   A.  I don't consider that -- I don't
24 remember him saying the word "capping" or anything.
25   Q.  Would it make any difference to you if

28 (Pages 106 to 109)

Richard Martinotti

Page 110

1  he did?
2      A.   I would have gone back to Tom and
3  corrected him that it's not a capping.
4      Q.   But you don't recall being on any of
5  those e-mails at the time?
6      A.   No.
7      Q.   Let's go to the second page of
8  Exhibit 74.  So, what happened on the BB&T deal, as
9  we've discussed, was an account level review,
10  correct?
11     A.   Correct.
12     Q.   And in an account level review, the
13  reasons why commissions would be adjusted is if the
14  quota is set incorrectly, if there is an error with
15  the quota?
16     A.   That's one example of where we would do
17  adjustments, yes.
18     Q.   Okay.  If the territory was set
19  incorrectly?
20     A.   Correct.
21     Q.   If the associated commissions generated
22  from the posted revenue were not representative of
23  the work contribution of the employee?
24     A.   Correct.
25     Q.   And then last, is there fairness/balance

Page 111

1  between each of the employees within the
2  transaction; is that correct?
3      A.   Correct.
4      Q.   So of those four, on what basis was --
5  were Bobby Choplin's commissions adjusted on the
6  BB&T deal?
7      A.   The work contribution and the balance.
8      Q.   Okay.  Are you sure about that?
9      A.   That's what I recall from the
10  conversations with Randolph at the time, you know,
11  when we were doing this.
12     Q.   Okay.
13     A.   But again, just for your edification,
14  that -- you know, the confirmation for that would
15  be Randolph.  I will implement what Randolph
16  underscored.
17              (Exhibit 75 was marked for
18              identification, as of 10/19/17.)
19  BY MR. LEE:
20     Q.   Okay.  Let me show you what I have
21  marked as Exhibit 75.  I will mark that page a
22  little bit, but feel free to read as much as you
23  need to get the context.
24          This is a series of e-mails about the
25  BB&T account level adjustment in August of 2015; is

Page 112

1  that correct?
2      A.   Correct.
3      Q.   It's a true and accurate copy of these
4  e-mails?
5      A.   Yes.
6      Q.   If you look at Page 213, IBM 213, the
7  second paragraph of Randolph Moorer's e-mail to you
8  on August 18th says, "I spoke with their North
9  American unit VPs, Sean Flynn and Phil Weintraub,
10  and confirmed that both territory and quota
11  assignments were accurate and appropriate with
12  respect to their peers in the U.S."
13          And that's he is saying there, Randolph
14  is telling you that Bobby Choplin's quota was
15  correct and his territory was correct, right?
16     A.   Right.
17     Q.   And the next sentence, "Both Sean
18  and Phil recognized that the achievements were
19  extraordinary and that an approach that applied
20  relative contribution was appropriate."
21          That's the end of the sentence, right?
22     A.   Correct.
23     Q.   I read that correctly?
24     A.   Yeah.
25     Q.   So the basis by which Mr. Moorer

Page 113

1  adjusted Mr. Choplin's commissions was relative
2  contribution; isn't that correct?
3      A.   Correct.
4      Q.   So that wasn't the fairness/balance;
5  that's the contribution?
6      A.   That's the work contribution, yeah.
7      Q.   And he says, "I propose that Tom be
8  assessed at 14 percent and Bobby at 12 percent."
9          What does that mean?
10     A.   I would have to go back to him.  I don't
11  know what that -- I don't recall what that -- what
12  that's referring to.
13     Q.   Could that be the percentage of the
14  revenue he was credited?
15     A.   No.  The revenue that he had was over
16  3 million, and that would have been -- no.  I don't
17  -- I would have to go back and look at what that --
18     Q.   Okay.  What do you need to answer that
19  question?  I've got some other things.  We can go
20  back to it, but I can maybe cut to the chase and
21  save some time.  What would you need to look at in
22  order to know?
23     A.   I would have to look at if he put
24  anything else in the master spreadsheet, and the
25  master spreadsheet is what he would then go through

Richard Martinotti

Page 114

1 and communicate to me what that meaning is.
2 In other words, to be honest with you,
3 what he writes here is all well and good, but
4 that's more for John Dunderdale and Scott.
5 What I go through and represent here
6 then is, you know, this spreadsheet, this is the
7 summary of the high to low, the top 50; and then it
8 talks to section one is they identified people that
9 he is going to adjust down; section two is the
10 capability of identifying people to adjust up; and
11 category three is just a summary of what he is
12 doing here. And so the spreadsheet itself would
13 have provided me the data that, you know, drove the
14 compensation for him.
15 Q. And so these adjustments of 14 percent
16 for Tom and 12 percent for Bobby, that was enough
17 to get Mr. Moorer back down to that 10 percent
18 commission budget, right?
19 A. It got him to 9.93 percent.
20 Q. So even a little below that?
21 A. Yeah.
22 Q. But he hit that rule of thumb, that
23 target, that guideline of 10 percent commissions by
24 making these adjustments to Tom's and Bobby's
25 commissions?

Page 115

1 A. For that specific account, yes.
2 Q. Were any of the sales reps on the BB&T
3 deal told that there was a commissions budget?
4 A. There isn't a commission budget. All
5 that is is a guideline.
6 Q. Okay.
7 (Exhibit 76 was marked for
8 identification, as of 10/19/17.)
9 BY MR. LEE:
10 Q. I'm going to show you an e-mail that
11 Randolph Moorer sent about the BB&T and the Labcorp
12 deal on July 13th, 2015. I have marked it as
13 Exhibit 76.
14 Okay. Here -- and the Labcorp deal,
15 because I think we see that referenced, that was
16 just another big deal that was under review at the
17 same time as BB&T, right?
18 A. Correct.
19 Q. Here it says, "Need to reduce by
20 $650,000. E/R is r 13 percent. Need to reduce by
21 650,000." Do you see that?
22 A. Correct.
23 Q. And that's in order to hit the 10
24 percent budget, right?
25 MR. BARNES: Objection. Go ahead.

Page 116

1 BY THE WITNESS:
2 A. Yeah, I would have to go back and look.
3 I would have to do the, you know, the calculations,
4 to be honest with you, so...
5 BY MR. LEE:
6 Q. So you don't know as you sit here today?
7 A. No.
8 Q. Let's keep going.
9 (Exhibit 77 was marked for
10 identification, as of 10/19/17.)
11 BY MR. LEE:
12 Q. I'm showing you what I have marked as
13 Exhibit 77. It's an e-mail on July 14th, 2015,
14 between Randolph Moorer and it, looks like, Cleo
15 Clarke?
16 A. Correct.
17 Q. That was Tom's manager, right, Tom
18 Stephenson, the other rep who was being reviewed?
19 A. Yes.
20 Q. And here, if you look at the thread --
21 feel free to take your time -- Randolph Moorer
22 says, "Cleo, I have no doubt that Tom has worked on
23 both Labcorp and BB&T. However, we have a serious
24 problem in that the commissions payout for these
25 two deals exceed the maximum and all high achievers

Page 117

1 including Tom must be reviewed."
2 When he says "exceed the maximum,"
3 what's he referring to?
4 A. There is no maximum. So, I mean,
5 outside of the fact that we have, you know, the
6 guideline of 10 percent, that is not a maximum.
7 Q. Okay. So he is not referring to a
8 budget, a commissions budget?
9 A. Right, he is not referring to a budget.
10 Q. And you don't know what he is referring
11 to; is that your testimony?
12 A. Yeah, correct, because we have -- I have
13 not given him one, Scott had not given him one.
14 Q. Okay.
15 A. The reality of the first half 2015
16 highlights the fact that we have not, you know,
17 adjusted people to 10 percent. We have paid people
18 greater than 10 percent.
19 (Exhibit 78 was marked for
20 identification, as of 10/19/17.)
21 BY MR. LEE:
22 Q. I'm showing you what I have marked as
23 Exhibit 78. This looks like it is Cleo Clarke's
24 response on those issues about Tom's adjustment.
25 If you look in the middle of the paragraph there,

Richard Martinotti

Page 118

1 Cleo is telling Randolph how much Tom has done on
2 the Labcorp deal. It starts, "The Labcorp deal is
3 especially painful because the entire deal was
4 based on the work we did" --
5      A.   Where?  Where are we?
6          MR. BARNES:  Do you have a copy of
7 that for me?
8          MR. LEE:  Didn't I give it to you?
9 I'm sorry.  Here you go.
10          MR. BARNES:  This is 71, right?  78?
11          MR. LEE:  Yep.
12          MR. BARNES:  Do you have a copy there?
13          MR. LEE:  Yeah, I do.  Thank you.
14 Just messed up.
15          MR. BARNES:  Thanks for highlighting
16 it for me.
17          MR. LEE:  You are welcome.
18          THE WITNESS:  Now I just found it.
19 I thought you said the middle here meant the
20 middle of the page --
21          MR. LEE:  I'm sorry.  I was confusing.
22          THE WITNESS:  -- versus the middle of
23 the paragraph.
24 BY MR. LEE:
25      Q.   Here we go.  And so Randolph is talking

Page 119

1 to Cleo, and his e-mail at the bottom, "Cleo, I
2 have modeled the transactions as discussed.  If we
3 cap both transaction at 250 percent on both primary
4 and secondary we see the following," and then he
5 says this is the impact of an adjustment on
6 commissions, right?
7          And "Total payments for the two
8 transactions would be 382,000 versus 972,000,"
9 and then it says, "The second employee only has
10 PCO2 issues."
11          It must be another one being reviewed on
12 the Labcorp deal, right?
13      A.   Probably, yeah.
14      Q.   And then Randolph Moorer, the VP of
15 software, says, "I recommend capping that on
16 Labcorp at 250 percent versus 497 percent."
17          Did I read that correctly?
18      A.   Correct.
19      Q.   So Mr. Moorer here is using the word
20 "cap" and "capping," isn't he?
21      A.   Correct.  He is using the word
22 "capping."
23      Q.   Okay.  So he is making that mistake that
24 you would correct him on, right?
25      A.   Exactly.

Page 120

1      Q.   But Mr. Moorer is the one -- is one of
2 the people who exercises judgment on these of how
3 much or how little to pay in commissions, right?
4      A.   Yes.
5      Q.   And so he seems to also be confused
6 about the difference between capping and adjusting
7 commissions.  Is that fair to say?
8      A.   I wouldn't -- no.  I would --
9          MR. BARNES:  I'm going to object to
10 that question, but go ahead.
11 BY THE WITNESS:
12      A.   Yeah.  You know, I can't go through and
13 read his mind, but, you know, I look at this as he
14 is using the word "capping" as a generic term, but
15 we are asking him to review both of the packages,
16 and he is going through and reviewing the packages,
17 and he is engaging all of his individual
18 salespeople.
19 BY MR. LEE:
20      Q.   And this -- Cleo is a second line
21 manager?
22      A.   She is a second line Z platform.
23      Q.   Okay.  So she may understand that this
24 is a capping kind of a procedure here if her VP
25 that she is working with is using that term?

Page 121

1      A.   She is understanding that we are going
2 through an account level inspection plan and they
3 were looking at the validation and adjustments,
4 yeah.
5      Q.   Okay.  So Cleo's response here, she is
6 worrying about Tom's reaction to this news about
7 how much money he is being reduced; is that right?
8      A.   Yes.
9      Q.   And she says, "The Labcorp deal is
10 especially painful because the entire deal was
11 based on the work we did to get Labcorp to commit
12 to Linux on Z as their platform of choice but the
13 payout is less than 50 percent of the commission."
14          Did I read that correctly?
15      A.   Yes.
16      Q.   So she is saying that Tom Stephenson,
17 the sales rep, did all the work on that deal.  Is
18 that your understanding?
19      A.   She is saying that he was a significant
20 contributor, yeah.
21
22
23
24
25

Richard Martinotti

Page 122

1    MR. BARNES: And let me -- excuse me.
2  Let me just object that the Labcorp deal is
3  outside the scope of the 30(b)(6) notice, but
4  by all means. I just wanted to put that on
5  the record.
6    MR. LEE: You know, we asked for him
7  to be ready to talk about documents produced
8  in discovery, and this is obviously one.
9    MR. BARNES: Sure. I asserted my
10  objection. I'm not saying you can't ask him
11  questions. I just asserted the objection.
12    MR. LEE: I just don't want to hear
13  later like, "Aw, well, he wasn't speaking for
14  IBM since I objected," but I can keep
15  proceeding.
16    MR. BARNES: I've asserted my
17  objection, and we will deal with anything that
18  comes up down the road.
19  BY MR. LEE:
20    Q. Now, what Ms. Clarke here is saying is
21  the entire deal was based on the work we did to get
22  Labcorp to commit, right?
23    A. That's her opinion. Cleo is lobbying
24  for her sales team. That's why you go through and
25  look at and bring in the entire senior management

Page 123

1  team.
2    In our organization -- and I know I'm
3  expanding this, but in our organization the
4  Z organization is an overlay of our direct sales
5  force, so in essence we have two people for every Z
6  transaction; and it's always, you know, an
7  interesting dialogue on who is the one that, you
8  know, drove it one way or the other.
9    And then on top of that, included in
10  that situation from an ELA perspective, you have
11  the software client leader who is the lead lead.
12  So, you have a number of people going through and
13  raising their hand and saying, "I'm the one that
14  was the lead, you know, bringing in, you know, the
15  transaction."
16    And that's where you go through and as
17  Randolph, being the senior in the region, to
18  coordinate all of that, that documentation; and
19  then if he has issues, he can still then sit down
20  and coordinate or discuss with John Dunderdale.
21  John, as the senior executive in North America,
22  understands and knows the transactions because, you
23  know, of his position.
24    (Exhibit 79 was marked for
25    identification, as of 10/19/17.)

Page 124

1  BY MR. LEE:
2    Q. Okay. I'm going to show you what I have
3  marked as Exhibit 79. This is between Sean Flynn
4  and Randolph Moorer in August of 2015 about the
5  BB&T deal; is that correct?
6    A. Yes.
7    Q. You have seen this before?
8    A. Yes.
9    Q. It's a true and accurate copy of this
10  e-mail correspondence?
11    A. Yes.
12    Q. So Mr. Moorer in his e-mail to Sean
13  Flynn, that's the direct line VP for Bobby Choplin,
14  right?
15    A. No. The direct line is actually
16  Randolph Moorer. Sean Flynn is the dotted-line
17  executive. Sean is the brand executive for North
18  America for Commerce. So, Tom reports in to Haleh
19  reports in to Randolph, so --
20    Q. Bobby?
21    A. Bobby, I'm sorry. Well, Bobby to Tom to
22  Haleh to Randolph.
23    So the sales organization in 2015
24  reported in to the region. The brand organization,
25  which is what Bobby was part of under that

Page 125

1  organization, is dotted-line to the executive,
2  which is Sean.
3    Q. Okay. I think I get that. Thank you.
4    So on the back page, this is similar to
5  the e-mail we discussed where this is the same
6  chart that you included in your initial e-mail on
7  this account level review at the very top, right?
8    A. Correct.
9    Q. And then that's the same, E/R percentage
10  should be in the range of 10 percent, right?
11    A. Correct.
12    Q. Which is not a budget, correct?
13    A. It's not a budget.
14    Q. Okay. And then he is identifying, you
15  know, some of the numbers about the commissions on
16  these deals, right?
17    A. Correct. The number of people that were
18  paid, the number of people less than 10-K; you
19  know, he is looking at, you know, the dynamics.
20    Q. And then there is a spreadsheet here
21  about, I guess, the commissions and percentage
22  quota and all that for people who worked on the
23  BB&T deal in the middle of the page, right?
24    A. Correct.
25    Q. That's the chart that's under PCO1; is

32 (Pages 122 to 125)

Richard Martinotti

Page 126

1   that right?
2       A.   Correct.
3       Q.   And below that it says, "As you can see,
4   Bobby is at 983 percent" -- and that means percent
5   of his quota, right?
6       A.   Correct.
7       Q.   -- "and consumes 28 percent of the
8   available commission budget."
9           Do you see that?
10      A.   Correct, yep.
11      Q.   Okay.  So he is using the word "
12  budget" there, but there is not a budget?
13      A.   There is not a budget.  All he is --
14  what he is referring to is the fact that the
15  bottom-line number is the bottom-line number and
16  that Bobby is consuming 28 percent of the full
17  total commission plan.
18      Q.   Okay.  I'm showing you what was
19  previously marked as Exhibit No. 24.  This is
20  e-mail correspondence between Tom Batthany and Joe
21  Aleardi on August 25th, 2015.  Have you seen this
22  before?
23      A.   Yes.
24      Q.   Okay.  And the title of this is "Bobby
25  Choplin Capped Amount," the subject of this e-mail.

Page 127

1   Do you see that?
2       A.   Um-hmm.  Yes, I'm sorry.
3       Q.   Is this a true and accurate copy of this
4   e-mail correspondence?
5       A.   I believe so.
6       Q.   Okay.  And here, just at the second
7   sentence of this e-mail, Tom Batthany is saying
8   that he has looked into what the reason was for
9   reducing Bobby Choplin's commission on this deal,
10  and the second sentence says, "The answer I get
11  from Randolph" -- and that's Randolph Moorer,
12  right?
13      A.   Yes.
14      Q.   "The answer I get from Randolph is the
15  ELA is overfunded."
16      A.   Yes.  That's what he --
17      Q.   Okay.  And is that true?
18      A.   No.  I mean, again, there is no budget
19  from an E to R point of review.
20      Q.   Okay.  But Randolph Moorer seems to
21  think that there is, doesn't it?  Doesn't he,
22  rather?
23          MR. BARNES:  Object to that question.
24      Go ahead.
25

Page 128

1   BY THE WITNESS:
2       A.   Randolph is going through and looking at
3   the 10 percent as a guideline and he is looking at
4   that going forward.
5   BY MR. LEE:
6       Q.   Okay.  And he keeps referring to it as a
7   budget, but he is just not correct about that?
8       A.   It's not a budget, and again, I can
9   validate that through both 2015 first half and
10  2000- -- and all other time periods where we have
11  gone through and released more commissions above
12  and beyond the 10 percent.
13      Q.   Okay.  So if a jury one day is resolving
14  this issue about whether this was or wasn't a
15  budget, it's your testimony that they should not
16  look to Randolph Moorer's language in these e-mails
17  where he calls it a budget over and over again; is
18  that true?
19      A.   Correct.  He is using that in a generic
20  terminology.
21      Q.   Much like he used the term "cap"?
22      A.   Correct.
23      Q.   So the jury shouldn't pay attention to
24  Mr. Moorer's words in these e-mails as he is going
25  through this review; is that what you are saying?

Page 129

1       A.   The jury should ask or Randolph should
2   explain, you know, his meaning behind the budget.
3   He should -- my -- my statement as an IBM
4   representative here is he needs to clarify, you
5   know, his terminology.  He is using generic terms,
6   interchanging generic terms, and he needs to be
7   more specific and clear.
8       Q.   I mean, Mr. Moorer, I guess, your
9   position would be he was being sloppy with his
10  language, right?
11      A.   Yeah.
12      Q.   In the second paragraph here, it looks
13  like Tom Batthany may be confused about this budget
14  issue too.  He says -- do you see the sentence
15  starting "Paying a rep" in the middle of the second
16  paragraph?
17      A.   Yes.
18      Q.   It says, "Paying a rep 50 percent of
19  what he was expected, because we are over budget
20  just does not seem fair."
21          Did I read that correctly?
22      A.   Yes.
23      Q.   And you just disagree with Tom's using
24  that word "budget" and concluding that that was the
25  reason for the adjustment?

Richard Martinotti

Page 130

1  A.  Correct.
2  Q.  Because the adjustment here was because
3  of Bobby's relative contribution, not because the
4  commissions that resulted were over budget?
5  A.  Correct.
6  Q.  And when IBM asks the jury to accept
7  that, IBM is also asking the jury to ignore this
8  language from IBM vice presidents, IBM managers
9  where they call this a budget and a reduction
10 because they were over budget; is that correct?
11 MR. BARNES:  Objection.
12 A.  I would say they need to clarify; they
13 would need to go back to Randolph and say -- and
14 ask him to clarify what his meaning was.
15 (Exhibit 80 was marked for
16 identification, as of 10/19/17.)
17 BY MR. LEE:
18 Q.  I will show you what I have marked as
19 Exhibit 80.  This is e-mail correspondence in
20 August of 2015 between Randolph Moorer and again
21 Cleo Clarke.  Have you seen this before?
22 A.  Yes.
23 Q.  And this is a true and accurate copy of
24 that e-mail correspondence?
25 A.  Yes.

Page 131

1  Q.  Randolph in his e-mail at the very top,
2  first line, he says, "To be clear," and this is
3  about -- first let me say, this is about Tom
4  Stephenson and his commissions on the BB&T and the
5  Labcorp deal, right?
6  A.  This is for Cleo, yes, because Cleo
7  doesn't have anybody on BB&T.
8  Q.  Well, Tom Stephenson was on BB&T, wasn't
9  he?
10 A.  But he wasn't being -- was he being part
11 of this --
12 Q.  He was.
13 A.  Okay.
14 Q.  I mean, I don't want you to take my word
15 for it, but if that refreshes your memory.
16 A.  Oh, that's right.  We did have two
17 people on BB&T, yep.  I apologize.
18 Q.  That's okay.
19 All right.  So, Randolph's first line
20 is, "To be clear.  We need to ensure we maintain an
21 affordable expense posture on each transaction and
22 commissions should account for about 10 percent of
23 the total deal value."
24 Did I read that correctly?
25 A.  Correct.

Page 132

1  Q.  He continues, "In the case of both the
2  Labcorp and BB&T transaction the commission expense
3  far exceeded the allowable range, and therefore
4  each person was evaluated on a relative
5  contribution.  Tom was evaluated as a high
6  contributor, along with some others.  However,
7  there was not sufficient budget to allow a full
8  payout, so reductions had to be made."
9  Did I read that correctly?
10 A.  Correct.
11 Q.  Okay.  But there wasn't a budget?
12 A.  There is no budget.
13 Q.  Okay.  When he says, "Tom was evaluated
14 as a high contributor along with some others," is
15 he referring to Bobby Choplin as one of the others
16 who was evaluated as a high contributor?
17 A.  I would have to go back to Randolph and
18 ask him.
19 Q.  There was no question that Bobby Choplin
20 had put significant work into the BB&T transaction,
21 was there?
22 A.  No.
23 Q.  He had contributed a lot of his efforts
24 as a sales representative for IBM towards making
25 that sale, right?

Page 133

1  A.  Right.
2  Q.  This was not an occasion where Bobby
3  Choplin just happened to have that territory and
4  never called on the account but ended up in the
5  system as getting credit for a sale; that's not
6  what happened here, right?
7  A.  Correct.  However, there was, as
8  highlighted in Randolph's other correspondence,
9  there was over 123 people, of which nine people
10 were significant individuals, and so that's what he
11 is referring to.  You were asking me about --
12 Q.  Okay.  So you are saying like Bobby
13 would have been one of the nine high contributors
14 along with Tom Stephenson and perhaps some others?
15 A.  Yeah, yeah.
16 Q.  I'm showing you what we have previously
17 marked as Exhibit 45.  Do you recognize this?
18 A.  This is his commission statement, "his"
19 being Bobby Choplin.
20 Q.  Okay.  So, at the very top it says
21 "Field Management System."  I guess that's the
22 system where --
23 A.  It's the FMS system.  That's the
24 commissions system, yep.
25 Q.  Okay.  That's something that's available

34 (Pages 130 to 133)

Richard Martinotti

Page 134

1  on IBM's system where a sales rep can go and see
2  what their commissions might be for a given sales
3  period?
4      A.   Yes.  He can query the FMS system
5  through a canned report and pull that information,
6  and he gets a statement on a monthly basis as well.
7      Q.   Okay.  And the information here is
8  accurate?
9      A.   It looks it, yeah, I got to believe,
10 yeah.
11      THE REPORTER:  I'm sorry?
12      A.   It looks it, but I got to believe, yeah.
13 I mean, it is.
14      Q.   I will also show you what I'm marking as
15 Exhibit 81.
16      (Exhibit 81 was marked for
17       identification, as of 10/19/17.)
18 BY MR. LEE:
19      Q.   This might help us understand these a
20 little better.  So between Exhibit 81 and Exhibit
21 45, we can see what Bobby's commissions payments
22 were for the first half of 2015, correct?
23      A.   Correct.
24      Q.   And this is after the adjustments were
25 made for the BB&T deal, correct?

Page 135

1      A.   Correct.
2      Q.   And so the revenue that Bobby was
3  credited on the BB&T deal was what?
4      A.   Revenue is not on here.  This is simply
5  the commissions.
6      Q.   This is his total commissions for that
7  period?
8      A.   Correct.  So what it talks to is --
9  yeah, this is his commissions.
10      MR. BARNES:  And you are talking about
11 Exhibit 81, just to be clear?
12      THE WITNESS:  Correct.
13      MR. LEE:  Sorry, yeah.
14 BY MR. LEE:
15      Q.   Exhibit 45 is what I'm talking about.
16      A.   Oh.
17      Q.   I'm sorry.  I should have been clear
18 about that.
19      A.   I will go back to this.
20      Where do we have the revenue?
21      So he has got for PCO1 3,971,965.  That
22 was on this specific statement for PCO1.  PCO2, a
23 million 7.
24      Q.   Okay.  And just for the jury who may not
25 understand the lingo there, you are talking about

Page 136

1  there was a primary and a secondary quota that
2  Bobby had.  The primary related to the BB&T deal.
3  The secondary did not relate to the BB&T deal,
4  right?
5      A.   Correct.
6      Q.   And if you look back -- I think this may
7  help.  If you look back at Exhibit 75, this is
8  where John Dunderdale approved the payout, the
9  adjustments on the BB&T deal.
10      A.   Okay.
11      Q.   And the Page 213, that shows the account
12 revenue that he was credited with 3.324 million for
13 that deal; is that correct?
14      A.   On what page, did you say?
15      Q.   213.
16      A.   Yeah, but this -- oh, there is Bobby.
17      Q.   At the bottom there.
18      A.   Yeah.  3 million 324.
19      Q.   Okay.  So that was his revenue credit,
20 and then we can look back at Exhibit 81, and that
21 will show us --
22      A.   He had more --
23      Q.   -- what his commission was from that,
24 right?
25      A.   Well, he had more achievement.  This is

Page 137

1  he has got an achievement record of 3 million 970,
2  so he has got $600,000 more achievement on his
3  commission statement than he does in this
4  inspection.
5      Q.   Okay.  So he must have had another deal
6  that applied to his primary?
7      A.   Correct, probably.
8      Q.   Maybe a couple deals, who knows.
9      So Bobby's commissions overall on that
10 primary category were reduced by $296,569, correct?
11      A.   Correct.
12      Q.   And how was that determined?
13      A.   I would have to go back to Randolph.  He
14 supplies that data in the spreadsheet, and that's
15 what I implement.
16      Q.   What data?
17      A.   He supplies the data of the adjustment,
18 so in the spreadsheet, in this spreadsheet.
19      Q.   Okay.  So that's just not the full
20 spreadsheet; there is more information?
21      A.   No.  There is more information that goes
22 out here.
23      Q.   I wonder if maybe over lunch you could
24 take a look at that.
25      A.   And do what?  What do you need me to do?

Richard Martinotti

Page 138

1    Q.  Let me know what -- on what basis Bobby
2  Choplin's commissions were adjusted.
3    A.  Okay.  I will see if I can find
4  something.
5    MR. LEE:  Now might be a good time.
6    MR. BARNES:  And let me just say that
7  Exhibit 75 cuts off some of the columns.  The
8  version that was produced has those columns
9  out to the right, so...
10    MR. LEE:  I'm not saying you didn't
11  produce the whole spreadsheet.  I think that
12  it was copy and pasted in this e-mail.  I
13  think that's what happened.  So, I mean, I'm
14  not quibbling over that or anything.  I just
15  would like to know what the final word is.
16    Okay.  Do you guys want to go ahead
17  and take a break, go off the record?
18    MR. BARNES:  Yeah, let's go off the
19  record.
20    THE VIDEOGRAPHER:  Going off the
21  record at 12:04 p.m.
22    (Lunch recess taken,
23    12:04 - 1:10 p.m.)
24    AFTERNOON SESSION
25    THE VIDEOGRAPHER:  Beginning Disk 3.

Page 139

1  We are back on the record at 1:11 p.m.
2  BY MR. LEE:
3    Q.  Mr. Martinotti, just coming back from
4  lunch, I will just remind you that you are still
5  under oath today.
6    A.  Yes, I do.
7    Q.  Okay.  One of the things that we talked
8  about looking into over lunch was how IBM arrived
9  at the reduction of Mr. Choplin's BB&T commission.
10  What's your understanding of how that reduction was
11  reached?
12    A.  What Randolph does or did was he went
13  through and filled out the spreadsheet that I gave
14  him that had the ability to do adjustments of -- of
15  commissions and revenue.  He went through and did
16  an adjusted number in there.
17    That's the number that was represented
18  in the follow-on correspondence from me to John and
19  to the incentives team.  However, I believe the one
20  area that you are still referring to is the 12
21  percent.  I believe I have a -- I mean, I can get
22  myself to a 12 percent range.  Whether or not
23  that's really the logic he used, I can't verify it,
24  is my problem.
25    Q.  Okay.  What's your best estimate of how

Page 140

1  that was reached?
2    A.  Taking the -- a 12 percent of the
3  overall commissions spent.
4    Q.  I see.  So the overall commissions -- I
5  guess we could go back to this big sheet here.  So
6  if we look at the overall commissions of 2.624
7  million, 12 percent of that is roughly -- let's
8  just do this math, I guess.  It's 2,624,822, okay.
9  That equals, you know, 12 percent of it is
10  $314,000.
11    A.  Yeah.
12    Q.  Okay.
13    A.  So whether or not he didn't put the
14  decimal points in there or that type of deal, I
15  don't know.
16    Q.  Oh, I see.
17    MR. BARNES:  Which number were you
18  working off of there, Matt?
19    MR. LEE:  Just the total commissions
20  on the Exhibit 64.
21    MR. BARNES:  Pre or post reduction?
22    MR. LEE:  Before any reduction was
23  taken.
24    MR. BARNES:  Okay.
25

Page 141

1  BY MR. LEE:
2    Q.  So that's -- I mean, what it looks like,
3  from what I'm looking at, is the whole deal was
4  19,677,000, roughly.  Total commissions on that was
5  $2,624,000 and some change.
6    A.  Correct.
7    Q.  And the net commissions was 1.954.
8  So, if you take that 2,624,000,
9  12 percent of that is like 314,000.
10    MR. BARNES:  Yeah, and -- I don't want
11  to testify.  So, I can clear this up on
12  redirect if you want me to.
13    MR. LEE:  You can just tell me and I
14  will ask him.
15    MR. BARNES:  Okay.  I think it is 12
16  percent of the net or 12 percent of the target
17  10 percent E to R.
18    MR. LEE:  Oh, okay.  So it really
19  would be --
20    MR. BARNES:  For Bobby, and 14 percent
21  of the target E to R for Tom.
22    MR. LEE:  We will see.  So if the 10
23  percent of the deal, the --
24    MR. BARNES:  It would be 1.967 times
25  12 percent, gets you to roughly what he was

Richard Martinotti

Page 142

1   paid on the deal.
2         MR. LEE: That's 236, so that's not
3   right, because he was -- Mr. Choplin was paid
4   $348,000. Wait. Let me get this right just
5   for the record.
6   BY MR. LEE:
7       Q.   The total commission payout that
8   IBM gave to Mr. Choplin for the BB&T deal was
9   $348,487.06; is that correct?
10      A.   Correct.
11      Q.   And the amount held back was $296,569?
12      A.   Correct.
13      Q.   And if there had been no holdback, the
14  total amount of commissions that Bobby Choplin
15  would have been paid is $645,056.06?
16      A.   Correct.
17      Q.   And as you sit here today, you don't
18  know how Mr. Moorer decided that $296,000 should be
19  used?
20      A.   Well, I know how he presented it in the
21  spreadsheet. I don't know how it relates to the 12
22  percent.
23      Q.   Okay. So how did he present it in the
24  spreadsheet?
25      A.   He went -- he does do an adjusted

Page 143

1   statement from the -- he was going through and
2   looking to pay Bobby at 450 percent of plan, and
3   that's what this equates to. So that's what --
4   that's what the spreadsheet calculation would be,
5   455 percent, 455 percent.
6       Q.   So he was looking to reduce the
7   commissions to whatever would bring it down from
8   the -- it was almost a thousand percent of his
9   quota that this --
10      A.   The adjusted, yeah.
11      Q.   -- achievement represented.
12            And he was looking to reduce the
13  commissions by an amount of money that would get
14  the total commissions paid, the net commissions on
15  the BB&T deal to about 10 percent, right?
16      A.   I would -- I would -- I guess he is
17  doing -- well, I shouldn't guess. I just know that
18  he went through and came up with that adjustment
19  for both Bobby and for Tom, so his background --
20      Q.   Mr. Martinotti, we are here today to
21  discuss how IBM --
22      A.   I will go through and say yes, yes, to
23  get him to 10 percent.
24      Q.   Okay. And that was using the relative
25  contribution approach, right --

Page 144

1       A.   Yes.
2       Q.   -- which looks at the contribution of
3   the salesperson to this deal to consider what
4   amount of money would be fair to pay them; is that
5   fair to say?
6       A.   Relative to, yes, correct.
7       Q.   Okay. And the information that IBM
8   is using to gauge what contribution a sales
9   representative made on a given deal is what's
10  provided to IBM by the first line manager, right?
11      A.   The first line manager, second-line,
12  through the line management chain, yeah.
13      Q.   Okay. Well, so who provided information
14  about Bobby Choplin's contribution on the BB&T
15  deal?
16      A.   Tom.
17      Q.   Okay. Anyone else?
18      A.   Haleh was part of -- was part of the
19  discussion as well.
20      Q.   That's Bobby's second line manager on
21  the account?
22      A.   Correct.
23      Q.   Anyone else?
24      A.   I think for Bobby himself, I think that
25  was the two of them, yep.

Page 145

1       Q.   Okay. So Bobby Choplin, Tom Batthany,
2   Haleh Maleki, those are the people who supplied
3   information about Bobby's contribution to the BB&T
4   deal?
5       A.   Yes.
6       Q.   And based on that information, Randolph
7   Moorer went back and adjusted the commissions to
8   reflect what he felt was appropriate on this deal;
9   is that fair to say?
10      A.   They send that information in
11  conjunction with Randolph understanding the rest of
12  the contri- -- the rest of the transaction, yes.
13  He then made his assessment.
14      Q.   Well, what information did Randolph
15  Moorer have about the other sales reps on the deal?
16      A.   So, this is an ELA once again. Right?
17  So once again we are going through and looking at
18  this transaction as a whole. This, no one sale
19  within the ELA is a unique or separate transaction.
20  They are all packaged together as a total.
21            So what's being assessed here is the
22  total $19 million plus transaction, of which, you
23  know, 3.3 million of it was Commerce, which is
24  Bobby.
25      Q.   My question is -- well, let me back up a

Richard Martinotti

Page 146

1   little bit. The materials that we are talking
2   about, Bobby Choplin's information, Tom Batthany's
3   information and Haleh Maleki's information about
4   Bobby's contribution, that was given in writing,
5   wasn't it?
6       A.   Yes.
7       Q.   Okay. And submitted in writing to
8   Randolph Moorer in order for him to make his
9   decision, right?
10      A.   Correct.
11      Q.   What other information was submitted to
12  Mr. Moorer in writing about the other sales
13  representatives on the BB&T deal?
14      A.   It would have been the same assessments
15  based on the other participants, the other 123
16  people that were part of that ELA.
17      Q.   It would have been or it was?
18      A.   He does -- he did -- he went through --
19  I can't -- I would have to go back into the
20  records. He did go through and review other people
21  more than just Bobby.
22      Q.   Who else did he review?
23      A.   He reviewed, as it highlights in his
24  other correspondence, there was nine people of
25  significant commissions.

Page 147

1       Q.   And so is it your testimony that
2   Mr. Moorer reviewed something in writing regarding
3   the contribution of each of those nine sales
4   representatives on the BB&T deal?
5       A.   Yeah.
6       Q.   And you've seen that?
7       A.   I have not seen it, but I know that
8   that's what he would have done.
9       Q.   How do you know that?
10      A.   Just because of his personality.
11      Q.   Okay. Are you speculating?
12      A.   Okay, I'm speculating, so I don't know
13  for sure.
14      Q.   Mr. Moorer hasn't told you, "I received
15  in writing a statement of the contribution of each
16  of these nine sales representatives," has he?
17      A.   Correct, he has not.
18      Q.   And in preparation for today, you didn't
19  review anything like that, did you?
20      A.   No, I did not.
21      Q.   Okay. So as you sit here today, you
22  cannot say that Bobby Choplin's contribution to
23  the BB&T deal was less than any of those nine
24  individuals who were reviewed, can you?
25      A.   No.

Page 148

1       Q.   So look at Exhibit 45, please.
2       A.   45. Yeah.
3       Q.   The reduction, the 296,000 reduction
4   that's taken on this is categorized as a claim.
5       A.   Right.
6       Q.   What does that mean?
7       A.   It's an adjustment. That's how we go
8   through. That's the terminology that we go through
9   in the FMS system. We do a claim, a manual
10  adjustment claim, and that's how it physically gets
11  processed in the FMS system.
12      Q.   Okay. So when IBM is using its judgment
13  and discretion to reduce commissions based on
14  relative contribution, it gets categorized as a
15  claim and the reduction is taken?
16      A.   Correct.
17      Q.   Okay. Was Bobby Choplin ever advised of
18  the basis of that reduction?
19      A.   He was advised by Tom, and we've gone
20  through some of the correspondence.
21      Q.   The reason Tom cited was that Randolph
22  Moorer told him IBM was over budget on the deal,
23  right?
24      A.   Yes.
25      Q.   Do you know how IBM arrived at the

Page 149

1   revenue credit for Bobby Choplin and the Commerce
2   team on the BB&T deal?
3       A.   How we arrived at it, did you ask?
4       Q.   Right.
5       A.   What happens is the -- a dealmaker
6   spreadsheet is built which identifies the part
7   numbers and the gross versus the discounted value.
8   That then is what is used to place an order into
9   the system. That order is then what gets invoiced
10  or billed, and that is what then is registered on
11  our ledger, IBM ledger.
12      Q.   Have you seen an achievement detail
13  report before?
14      A.   Yeah, yes. I'm sorry. Yeah.
15      Q.   I'm going to show you what I've marked
16  as Exhibit 43.
17          MR. LEE: I've only got two of these,
18      if you wouldn't mind looking at...
19          MR. BARNES: I think I have got it,
20      actually. That's 43?
21          MR. LEE: That's right.
22  BY MR. LEE:
23      Q.   This is part of IBM's FMS system, isn't
24  it?
25      A.   It is a Cognos report that queries the

Richard Martinotti

Page 150

1  FMS system, yes.
2     Q.  Okay.  And just to put that in plain
3  English for our jury, this is a report that IBM
4  employees can use to access information from that
5  FMS system, right?
6     A.  Yes.  It's a very robust reporting
7  process that allows them to go through and query,
8  yes.
9     Q.  Okay.  Is the information on this report
10 accurate?
11    A.  I don't -- I don't know, to be honest
12 with you, because I don't know the premise of how
13 he created the -- the report.  I mean, he's got a
14 report here.  He's got a report that shows $6.6
15 million worth of revenue.  He's got part numbers
16 here.
17        What I don't know is whether or not this
18 is representing the gross transaction or the net
19 transaction and whether or not this is license,
20 including the support and subscription or just
21 license.  So, I would really have to go and ask him
22 how he pulled this report.
23    Q.  As you sit here today, can you say that
24 the information on this report is not accurate?
25    A.  If we are saying that this -- well, this

Page 151

1  is saying that this is BB&T.  The revenue
2  recognition that we have for BB&T for Commerce is
3  the 3 million 3.3 and this is showing 6.6.  So,
4  this is, like I said, either showing a gross versus
5  the discounted value, we pay on discount,
6  discounted value, and/or he could have the support
7  and subscription which, again, he is not paid on.
8     Q.  Okay.
9     A.  So whether -- you know, is the 6.6
10 accurate?  It could be accurate if that's what this
11 report is representing.  Right?  But I will tell
12 you, I don't know because he doesn't have his query
13 here.  He doesn't have -- he doesn't show how he
14 accessed the report.
15    Q.  What do you mean?  What options would
16 you have?
17    A.  He can go in there and, you know, query
18 the whole -- you know, he can go gross to net.  He
19 can go license to support and subscription.  He can
20 go through and look at channel content, a whole
21 number of other, you know, aspects.
22        He needs to query it correctly to -- you
23 know, if he is looking for the net value to
24 represent or tie back to his 3.3, he needs to make
25 sure that he is querying net rather than gross.

Page 152

1  That's all I'm saying.
2     Q.  You saw this before today, didn't you?
3     A.  Yeah.
4     Q.  Did you look at this in preparation for
5  today?
6     A.  I did not go back to query the report
7  to -- you know, I see the report.  I did not go
8  back and query the report.
9     Q.  That's something you could have done?
10    A.  2015, yeah, we would have this on our
11 system.
12    Q.  And it looks like this is all
13 information related to software from the Commerce
14 team that was purchased by Branch Banking & Trust,
15 BB&T, right?
16    A.  Correct.
17    Q.  And this is the right period, isn't it?
18    A.  Aside from there is a 2014 transaction
19 on here.
20    Q.  All right.  Just 30,000?
21    A.  I get it, but you just asked me the
22 question.
23    Q.  Sure.  No, no, no.  I want to be
24 complete.  You are doing the right thing.  I just
25 want to make sure it's clear.

Page 153

1     A.  Yeah.
2     Q.  Let me put it this way:  This
3  information could be accurate, but as you sit here
4  today, you don't know whether it is or isn't?
5        MR. BARNES:  Objection, asked and
6  answered.
7  BY MR. LEE:
8     Q.  You can answer.
9        MR. BARNES:  Go ahead.
10    A.  It could be accurate based on the fact
11 that this is reflecting gross rather than net.
12    Q.  But you don't know that to be the case
13 either, right?
14    A.  Well, I would lean towards that because
15 the -- the FMS system represents exactly what we
16 have on the ledger, and the ledger has for his
17 territory, for his products and for his sales plan
18 $3.3, and that's what I do believe.  That's what I
19 do -- I mean, that's what we go and report to the
20 street.  That has to be accurate, and that is a net
21 value.
22        So, you know, comparing the 3.3 versus
23 the 6.6, the 6.6 I could assume is either the gross
24 plus S and S or just gross, but it can represent
25 the transactions, yes.

39 (Pages 150 to 153)

Richard Martinotti

Page 154

1    Q.   Other than IBM's right to review
2  significant transactions and, in this case, make a
3  contribution adjustment, are there any other
4  reasons that IBM relies on to support modification
5  of Bobby Choplin's commissions payments on the BB&T
6  deal?
7    A.   Is there any other -- try that again.
8  I'm sorry.
9         MR. LEE:  Would you mind reading that
10       back?
11        THE REPORTER:  Question:  "Other than
12       IBM's right to review significant transactions
13       and, in this case, make a contribution
14       adjustment, are there any other reasons that
15       IBM relies on to support modifications of
16       Bobby Choplin's commission payments on the
17       BB&T deal?"
18  BY THE WITNESS:
19    A.   In this case they are looking at the
20  contribution.  They validated that the territory
21  was correct and the quota was correct, yeah.
22  BY MR. LEE:
23    Q.   So my question is, are there any other
24  reasons besides that?
25    A.   So, that was why I was asking the

Page 155

1  question.  There would be other reasons.  There
2  would be other -- in the -- in the disclaimer, as I
3  -- as we talked about, we are looking at, you know,
4  are we validating the territory, are we validating
5  the quota, are we validating the contribution.  So,
6  yeah, there is more than just contribution he is
7  looking at, if that's what you are asking.
8    Q.   No, it's not what I'm asking.
9    A.   Oh, okay.  I'm sorry.
10    Q.   I think your answer was more
11  hypothetical and mine is what was actually done,
12  what was actually done for Bobby Choplin on this
13  deal.  Are there any other reasons that IBM is
14  relying on, any other justifications for adjusting
15  Bobby Choplin's commissions on the BB&T deal?
16    A.   And the answer is no.
17    Q.   Okay.  So IBM is not claiming that Bobby
18  failed to comply with his IPL, are they?
19    A.   Correct, they are not.
20    Q.   IBM is not claiming that Bobby failed to
21  follow some other guideline or policy, is it?
22    A.   Correct.
23    Q.   And IBM is not alleging any fraud or
24  misrepresentation or misconduct by Bobby Choplin?
25    A.   Correct.

Page 156

1    Q.   I have seen some information in the
2  record that the BB&T deal could be as large as
3  80 to 90 million total.  Is that accurate?
4    A.   That would be including the support and
5  subscription, you know, the full package, the full
6  breadth of the transaction.  The 19 million
7  represents the license.
8    Q.   Okay.  And so that is the amount that
9  would apply to the software team; is that correct?
10    A.   Correct.
11    Q.   Okay.  And there was -- that was only
12  maybe a quarter, 25 percent of the deal, right?
13    A.   Correct, yeah.
14    Q.   Okay.  What was the rest of the deal, do
15  you know?
16    A.   I can't -- it's the support and
17  subscription.  There was some services that were in
18  there, but the rest of that revenue is not part of
19  their sales plan.  That's why it's not recognized
20  for them.
21    Q.   What does that mean?
22    A.   In other words, the sales plan for that,
23  for Bobby and others is transactional only.  We are
24  paying them to focus on the transactional.
25  Everything else comes forward.

Page 157

1        By selling the transaction, the
2  importance of selling transactional is we drag the
3  support and subscription, so that's why we are
4  focusing on transactional.
5    Q.   Okay.  Let me make an analogy that I
6  would understand; I hope somebody else would too.
7        My dad for his career sold pumps, and
8  when they would sell pumps, they would sell the
9  pump to a manufacturer and then then would also
10  service the pump over a, you know, period of time.
11  Okay?
12    A.   Um-hmm.
13    Q.   So in that situation what you are saying
14  is the transactional is the cost of the pump and
15  selling the pump to the manufacturer, and so it
16  would include that if the pump cost a hundred
17  dollars; and then the service package, which may be
18  another $200 over five years, that's not included,
19  right?
20    A.   Correct.
21    Q.   Okay.  So, if the BB&T deal was $80
22  million, then roughly 20 million was the software
23  itself, BB&T purchasing the right to use that
24  software.  The other 60 million of the deal was IBM
25  servicing that software, maintaining it, keeping it

Richard Martinotti

Page 158

1  up-to-date and working with any bugs or any
2  problems that BB&T has over time?
3      A.   Correct.
4          MR. LEE:  Give me just a second.
5          THE WITNESS:  No problem.
6          MR. BARNES:  My father-in-law
7  engineered pumps for his career, so I wonder
8  if --
9          MR. LEE:  Oh, really?
10         MR. BARNES:  -- your dad and my
11  father-in-law met.
12         MR. LEE:  Maybe, yeah.
13         MR. BARNES:  You said that and my ears
14  perked up.
15         MR. LEE:  I will have to ask you who
16  he worked for when we are done.
17  BY MR. LEE:
18     Q.   Would you agree that caps on commissions
19  demotivate sales representatives?
20     A.   Yes.
21     Q.   Is that part of the reason that IBM does
22  not have caps on commissions?
23     A.   Yes.
24     Q.   And so having a compensation plan where
25  commissions are uncapped is designed to motivate

Page 159

1  sales representatives to achieve high sales?
2      A.   Yes.
3      Q.   All right.  I want to talk to you about
4  the Phillips deal.  Do you know what I'm talking
5  about when I say that?
6      A.   It's a SaaS transaction that happened in
7  2013.
8      Q.   Okay.  And Bobby Choplin started working
9  with IBM in late 2012?
10     A.   November 2013.
11     Q.   November 2012, right?
12     A.   '12, yes.  I'm sorry.  Yeah, '12.
13     Q.   In fact, his first commission plan for
14  IBM was the first half of 2013, wasn't it?
15     A.   Correct.
16     Q.   And that was the period during which the
17  Phillips deal closed, wasn't it?
18     A.   Yes.
19     Q.   And you said that was a SaaS deal,
20  and we may have already said that, but that's
21  software --
22     A.   Software as a service.
23     Q.   Okay.  And explain for the jury in
24  layman's terms what that means.
25     A.   It converts our license into an annuity

Page 160

1  or a monthly rental, essentially, and it's a form
2  of billing that the customer will come to us and
3  ask us to build a SaaS environment whereby we will
4  go through and lease back the licenses and the
5  support and the subscription of that product, you
6  know, so that they get it and that they don't have
7  to carry it as an operating lease.
8      Q.   And that was a new product in 2012,
9  2013?
10     A.   Yes.
11     Q.   And Bobby Choplin had a great
12  performance with the Phillips deal in the first
13  half of 2013; would you agree with that?
14     A.   Yes.
15     Q.   In fact, I think some of the IBM
16  executives called him a -- called his performance
17  on that deal a poster child for high achievement on
18  a SaaS deal.  Would you agree with that?
19     A.   He was -- he was lauded, yes.
20         (Exhibit 82 was marked for
21         identification, as of 10/19/17.)
22  BY MR. LEE:
23     Q.   Just so I'm not speaking in
24  generalities, I show you what I have marked as
25  Exhibit 82.  If you'd look over at Page 4185.  I

Page 161

1  think it's Page 8 of the exhibit.
2          It's giving an example of what they call
3  a big win with this Phillips BVA deliverable.  It
4  says, "A poster child win for brand new rep Bobby
5  Choplin."  Do you see that?
6      A.   Correct.
7      Q.   And have you seen that before?
8      A.   To be honest, this specific package, no,
9  but I've heard of -- yes -- no, I have not seen
10  this specific one.
11     Q.   Did you hear these kinds of --
12     A.   Yes.  Well, I shouldn't say that before
13  you've asked your question.
14         MR. BARNES:  Yeah, let him finish his
15  question first.
16  BY MR. LEE:
17     Q.   So you had heard these kind of positive
18  comments about Bob Choplin's performance --
19     A.   Yes.
20     Q.   -- around the time that he closed that
21  deal?
22     A.   Yes.  Just as, you know, I've heard --
23  it's a common occurrence when a significant
24  transaction happens.  We have a process and a
25  system in IBM whereby we will go through and

Richard Martinotti

Page 162

1   highlight significant transactions just so that
2   others can glean and learn from the -- you know,
3   the activity.
4       Q.   And that, IBM figured out deciding to
5   hold back part of Mr. Choplin's commissions on that
6   deal, correct?
7       A.   That was a situation whereby his quota
8   was not set correctly, and so consequently they
9   adjusted his earnings due to the quota.
10      Q.   So IBM determined that there was an
11  error in the assignment of his quota and corrected
12  that error?
13      A.   Correct.
14      Q.   Okay.  And just the correction of that
15  error alone resulted in a lower commission?
16      A.   Resulted in the lower commission, yes.
17      Q.   Okay.  So there wasn't a cap placed on
18  Bobby's commissions for the Phillips deal?
19      A.   That was not a cap, no.
20      Q.   Okay.  And there wasn't a claim or a
21  reduction made for his relative contribution or
22  anything like that?
23      A.   Correct.  That was solely Bobby, and
24  that was the quota.
25      Q.   So this was not an ELA or an account

Page 163

1   level review?
2       A.   Correct, it was not.
3       Q.   Okay.  This was just a deal driven by
4   Bobby Choplin?
5       A.   That was simply by Bobby.  That was a
6   SaaS review.
7       Q.   So this was different than the BB&T
8   review?
9       A.   If you go back to, remember, there was
10  the four that we talked about.
11      Q.   Right.
12      A.   SaaS was one of them.
13      Q.   Okay.  Since it was a new product, you
14  were reviewing those transactions more frequently
15  to make sure that the commissions were in line with
16  what IBM expected?
17      A.   Correct.
18      Q.   And in this case, IBM identified the
19  quota error and corrected it and the commissions
20  worked themselves out?
21      A.   Correct.
22           (Exhibit 83 was marked for
23           identification, as of 10/19/17.)
24  BY MR. LEE:
25      Q.   I'm going to show you what I have marked

Page 164

1   as Exhibit 83.  This is an e-mail from Michael
2   Madsen, September 15th, 2013, and this includes
3   your initial e-mail to the group and then
4   Mr. Madsen's recommendation after reviewing this;
5   is that correct?
6       A.   Yes.  My note is here behind here,
7   August 14th; and this is September 15th, yes.
8       Q.   Is this a true and accurate copy of this
9   e-mail?
10      A.   Yes.
11      Q.   And if you flip over to the third page,
12  Mr. Madsen came to this -- strike that.
13           Mr. Madsen corrected the quota error --
14  well, strike that.  I'm sorry.  Give me one more
15  time.
16           MR. BARNES:  Third time is a charm.
17           MR. LEE:  That's right, usually.
18  BY MR. LEE:
19      Q.   Ms. Surrette, Deborah Surrette was also
20  involved in this review, correct?
21      A.   Correct.
22      Q.   And she has an e-mail down here on
23  September 13th, and she has made a recommendation
24  to Mr. Madsen, and her recommendation is that
25  Mr. Choplin's quota should be corrected and brought

Page 165

1   in line with average SaaS quota in North America;
2   is that correct?
3       A.   I'm looking for her note in here.  There
4   is Deborah.  "Janet and Mark, Attached you will
5   find a workbook containing three things.  Current
6   recommendation...."  Yeah, okay.  I got it.
7       Q.   And actually, I said in North America,
8   but it says East IMT.  What does that mean?
9       A.   That's the region.  That's the
10  geographic footprint, so that's state of New York.
11  You know, that's all that is.
12      Q.   It's Bobby's region?
13      A.   Yeah.
14      Q.   Okay.  So it looks like there is 66
15  other sales reps in that region.  Total quota was
16  11.9 million.  I have gone ahead and done the math
17  for us.  That equals 180,000 per sales rep, and
18  that's what the adjustment was, right?
19      A.   Yes.
20      Q.   So the adjustment here was different
21  than what went on in the BB&T deal; that's correct?
22      A.   Correct.  This is a -- this is a
23  different inspection.  It was based on a different
24  rationale, but it was an inspection, yeah.
25      Q.   We talked about lawsuits that had been

Richard Martinotti

Page 166

1  brought against IBM related to commissions earlier.
2  I would like to talk more specifically about them.
3       Are you familiar with the salesman by
4  the name of Niels Jensen?
5       A.  No.
6            (Exhibit 84 was marked for
7            identification, as of 10/19/17.)
8  BY MR. LEE:
9       Q.  I show you what I have marked as
10 Exhibit 84.  This was a IBM sales representative.
11      A.  2000.  Oh, he was hired in 2000.  Sorry.
12      Q.  That's okay.  Niels Jensen was a sales
13 representative for IBM; is that your understanding?
14           MR. BARNES:  You can take some time to
15 read through that if you need to.
16           MR. LEE:  As long as you need to.
17 BY THE WITNESS:
18      A.  It says here that he was hired in 2000
19 as a software sales representative, so yes, he is
20 an IBM employee.
21 BY MR. LEE:
22      Q.  Okay.  And this lawsuit involved unpaid
23 commissions?
24           MR. BARNES:  Again, you can take the
25 time to read through this document if you need

Page 167

1  to.
2  BY MR. LEE:
3       Q.  You can take that as a given any time I
4  hand you a document.  I want you to take your time
5  and make sure you understand it.  Don't answer one
6  of my questions before you are ready.  Okay?
7       A.  Got it.  And the question was again?
8       Q.  That Mr. Jensen sued IBM over unpaid
9  commissions.
10      A.  Yes.
11      Q.  Just let me know when you are ready.
12      A.  So Jensen is looking for $2.6 worth of
13 commissions, is what this is saying.
14      Q.  Okay.  And Mr. Jensen was claiming that
15 IBM was bound to pay him commissions under the
16 commission formula; is that correct?
17           MR. BARNES:  And let me just say that
18 I'm going to object to the extent that this is
19 asking about facts that aren't in evidence and
20 to the extent that you are asking
21 Mr. Martinotti to make any legal conclusions.
22 BY MR. LEE:
23      Q.  You can answer.
24      A.  And I've got to say, I don't know.
25      Q.  Let me give you one that we have

Page 168

1  discussed a little bit and you are familiar with.
2            (Exhibit 85 was marked for
3            identification, as of 10/19/17.)
4  BY MR. LEE:
5       Q.  I'm marking as Exhibit 85, this is a
6  copy of the complaint in the Schwarzkopf versus IBM
7  case.  You are familiar with that case, aren't you?
8       A.  Yes.
9       Q.  And Mr. Schwarzkopf was a sales
10 representative?
11      A.  Yes.
12      Q.  At IBM, of course.  And he is by this
13 complaint suing IBM over unpaid commissions?
14      A.  Correct.
15      Q.  And Mr. Schwarzkopf is claiming that IBM
16 was bound to pay him commissions under the formula
17 they provided, correct?
18      A.  Correct.
19      Q.  And then Mr. Schwarzkopf claimed that
20 his commissions were unjustifiably reduced; is that
21 correct?
22           MR. BARNES:  And I'm just going to
23 make the same objections that I made on the
24 previous exhibit, but go ahead.
25      A.  Yeah.  He came forward and objected to

Page 169

1  how we approached him.
2       Q.  Mr. Schwarzkopf said that his
3  commissions had been capped and IBM wasn't allowed
4  to cap his commissions; isn't that right?
5       A.  Correct, and we did not cap his
6  commissions and he did not win this suit.
7       Q.  Mr. Schwarzkopf misunderstood IBM's
8  compensation program, didn't he?
9       A.  Correct.
10           (Exhibit 86 was marked for
11           identification, as of 10/19/17.)
12 BY MR. LEE:
13      Q.  I'm showing you a copy of Exhibit 86.
14 Are you familiar with this lawsuit?
15      A.  Yes.  This was my first one.
16      Q.  This was Kavitz versus IBM?
17      A.  Correct.
18      Q.  When you said it was your first one,
19 this was the first case --
20      A.  Deposition.  Sorry.
21      Q.  Okay.  And Mr. Kavitz was a sales
22 representative at IBM?
23      A.  Yes.
24      Q.  And he sued IBM over unpaid commissions;
25 is that correct?

43 (Pages 166 to 169)

Richard Martinotti

Page 170

1    A.   Correct.
2    Q.   And he claimed IBM was bound to pay him
3  commissions under the formula they provided,
4  correct?
5         MR. BARNES:  Then let me just restate
6  the same objections.
7         MR. LEE:  I will give you a line
8  objection.  What was it?  Legal conclusions?
9         MR. BARNES:  Yeah, that's fine.  As to
10  complaints or decisions from any of these
11  cases, I object to the extent it's calling for
12  a legal conclusion and to the extent it is
13  assuming facts that aren't in evidence, and I
14  don't interrupt any more.
15  BY THE WITNESS:
16    A.   I mean, the answer would be yes because
17  he obviously, you know, brought this case forward.
18  BY MR. LEE:
19    Q.   And you gave a deposition in that case,
20  so you know the facts, don't you?
21    A.   Um-hmm.  Yes.  I'm sorry.
22    Q.   And my question is, Mr. Kavitz was
23  claiming IBM was bound to pay him commissions under
24  the formula they provided, right?
25    A.   Correct.

Page 171

1    Q.   And that IBM could not cap his
2  commissions, right?
3    A.   Correct.
4    Q.   And Mr. Kavitz misunderstood IBM's
5  compensation plan, didn't he?
6    A.   Correct.
7         (Exhibit 87 was marked for
8         identification, as of 10/19/17.)
9  BY MR. LEE:
10    Q.   I'm showing you what I have marked as
11  Exhibit 87.  This is a copy of another complaint
12  filed by Stephen Rudolph against IBM in the
13  Northern District of Illinois Federal Court.
14         Are you familiar with this case?
15    A.   No.
16    Q.   Have you ever heard of Stephen Rudolph.
17    A.   I knew of Stephen as a software sales
18  rep, yes.
19    Q.   Okay.  Did you know that he had sued
20  IBM?
21    A.   No, I did not.
22    Q.   And so I'm not going to ask you to read
23  through that and tell me anything about it.
24         You don't know anything about this case
25  other than what's written in this document?

Page 172

1    A.   Correct, I do not know anything about
2  this case.
3         (Exhibit 88 was marked for
4         identification, as of 10/19/17.)
5  BY MR. LEE:
6    Q.   I'm showing you what I have marked as
7  Exhibit 88.
8         MR. BARNES:  I would be happy to
9  answer all of your questions about this case
10  if you would like me to, Matt.
11         MR. LEE:  You're next.
12  BY MR. LEE:
13    Q.   Mr. Martinotti, this is a copy of a
14  complaint that was filed in the Superior Court of
15  the state of California in Los Angeles by Kelli
16  Gilmour against IBM.
17         Are you familiar with this case?
18    A.   No.
19    Q.   Have you ever heard of Kelli Gilmour?
20    A.   No.
21         (Exhibit 89 was marked for
22         identification, as of 10/19/17.)
23  BY MR. LEE:
24    Q.   Showing you a copy of what I have marked
25  as Exhibit 89.  This is a copy of a complaint filed

Page 173

1  in California in the City and County of San
2  Francisco by Lee Kemp against IBM.
3         Are you familiar with this case?
4    A.   No.
5    Q.   Have you ever heard of Lee Kemp?
6    A.   No.
7         (Exhibit 90 was marked for
8         identification, as of 10/19/17.)
9  BY MR. LEE:
10    Q.   I'm showing you what I have marked as
11  Exhibit 90.  I'm showing you -- this is a copy of a
12  complaint filed in Colorado State Court in Denver
13  by David Geras against IBM.
14         Are you familiar with this case?
15    A.   No.
16    Q.   Do you know who David Geras is?
17    A.   No.
18    Q.   That's G-e-r-a-s.
19         (Exhibit 91 was marked for
20         identification, as of 10/19/17.)
21  BY MR. LEE:
22    Q.   I'm showing you a copy of what I have
23  marked as Exhibit 91.  This is a copy of a
24  complaint filed in Nebraska by Eric --
25    A.   Bereuter.

Richard Martinotti

Page 174

1    Q.   There we go.
2         -- Eric Bereuter, that sounds good,
3    against IBM.  Are you familiar with this case?
4    A.   No.
5    Q.   Do you know Eric Bereuter?
6    A.   No.
7    Q.   I think I have got one you might know.
8    A.   Oh.
9         (Exhibit 92 was marked for
10        identification, as of 10/19/17.)
11   BY MR. LEE:
12   Q.   Showing you a copy of what I have marked
13   as Exhibit 92.  This is a complaint filed in
14   Georgia by Peter Wilson against IBM.
15        Are you familiar with this case?
16   A.   Yes.
17   Q.   Okay.  You gave deposition testimony in
18   this case; is that correct?
19   A.   Correct.
20   Q.   So Mr. Wilson was a sales representative
21   for IBM, correct?
22   A.   Correct.
23   Q.   And he was suing over unpaid
24   commissions?
25   A.   Correct.

Page 175

1    Q.   And he was claiming IBM was bound to pay
2    him under the commission formula that he
3    provided, correct?
4    A.   Correct.
5    Q.   And he claimed that his commissions were
6    capped unjustifiably; is that correct?
7    A.   Correct.
8    Q.   Mr. Wilson, like the others,
9    misunderstood IBM's compensation plan, didn't he?
10        MR. BARNES:  I'm going to object to
11   the extent "the others" is unclear.
12        MR. LEE:  I will rephrase.
13        MR. BARNES:  I assume you are talking
14   about the other lawsuits, but...
15        MR. LEE:  I will rephrase.
16   BY MR. LEE:
17   Q.   Like Mr. Schwarzkopf, like Mr. Kavitz,
18   Mr. Wilson misunderstood IBM's compensation plan,
19   didn't he?
20   A.   Correct.
21        Well, can I amend that?  They
22   misunderstood why we did the adjustment versus they
23   misunderstood the sales plan.
24   Q.   And what do you mean by that?
25   A.   The sales plan represents what they, you

Page 176

1    know, are paid on.  He is not disputing he is being
2    paid on it.  What he is disputing is that we did an
3    adjustment and he is saying that we capped it.
4    We didn't cap it.  We adjusted it for different
5    reasons.  That's not misunderstanding the sales
6    plan.
7    Q.   He claimed that IBM didn't have a right
8    to adjust the sales plan, right?
9    A.   Correct.
10   Q.   So he misunderstood that IBM claimed it
11   did have a right?
12        MR. BARNES:  Objection.
13   A.   Well, but again, it's in the IPL that he
14   signed.  The disclaimer is in the IPL.
15   Q.   I understand that, but Mr. Wilson didn't
16   understand that, did he?
17        MR. BARNES:  Objection.
18   A.   That's why he brought the suit, yes.
19        (Exhibit 93 was marked for
20        identification, as of 10/19/17.)
21   BY MR. LEE:
22   Q.   I'm showing you a copy of what I have
23   marked as Exhibit 93.  This is a lawsuit filed in
24   U.S. District Court for the District of Maryland by
25   Michelle Leslie against IBM.

Page 177

1         Are you familiar with this case?
2    A.   No.
3    Q.   And do you know Michelle -- oh.  I said
4    Michelle.  It's Michael.
5    A.   Michael, yeah.
6    Q.   I'm sorry.  Michael Leslie.  Are you
7    familiar with Michael Leslie?
8    A.   No.
9         (Exhibit 94 was marked for
10        identification, as of 10/19/17.)
11   BY MR. LEE:
12   Q.   I'm showing you what I've marked as
13   Exhibit 94.  So this is a lawsuit filed in the U.S.
14   District Court for the District of New Jersey by
15   Griffin Pero versus IBM; is that correct?
16   A.   Yes.
17        MR. BARNES:  I'm just going to object
18   to the extent it mischaracterizes the
19   pleadings here.
20        MR. LEE:  It does.  I'm sorry.  Let me
21   restate it.
22   BY MR. LEE:
23   Q.   The first page of this is a declaration
24   in support of removal.  If you look to Exhibit A,
25   that was the lawsuit that was filed in New York

Richard Martinotti

## Page 178

1  State Court -- no -- New Jersey, New Jersey State
2  Court by Griffen Pero against IBM.  Is that
3  correct?
4      A.  Yes.
5      Q.  Okay.
6      A.  Superior Court of New Jersey.
7      Q.  Are you familiar with this suit?
8      A.  No, I don't believe I am.
9      Q.  Do you know Griffen Pero?
10     A.  I know the name, but I don't recall
11 this.
12     Q.  Is Griffen Pero a sales representative
13 for IBM?
14     A.  Yes.
15     Q.  Do you know if this lawsuit involved a
16 dispute over commissions, over unpaid commissions?
17     A.  I don't know that.
18         (Exhibit 95 was marked for
19          identification, as of 10/19/17.)
20 BY MR. LEE:
21     Q.  I'm showing you what I have marked as
22 Exhibit 95.  This is a lawsuit filed in a Virginia
23 court by Charles Tang against IBM and Will Martin.
24         Are you familiar with this lawsuit?
25     A.  No.

## Page 179

1      Q.  Do you know Charles Tang?
2      A.  No.
3          (Exhibit 96 was marked for
4           identification, as of 10/19/17.)
5  BY MR. LEE:
6      Q.  I'm showing you what I have marked as
7  Exhibit 96.  It is a lawsuit filed in Georgia State
8  Court by Steve Snyder versus IBM.
9          Are you familiar with this lawsuit?
10     A.  I am not.
11     Q.  Do you know Steve Snyder?
12     A.  No, I do not.
13         (Exhibit 97 was marked for
14          identification, as of 10/19/17.)
15 BY MR. LEE:
16     Q.  I'm showing you what I have marked as
17 Exhibit 97.
18     A.  That was an acquisition situation, that
19 96 one.
20     Q.  I just want to --
21     A.  The amount that I was reading so far was
22 that it was an acquisition, but...
23         MR. BARNES:  Okay.  Wait until he asks
24 you a question.
25         THE WITNESS:  Sorry.

## Page 180

1  BY MR. LEE:
2      Q.  Yeah, and you know, I think the court or
3  the jury or anyone could come back and read this
4  complaint or any of these complaints just as well
5  as we can, so my goal here is to find out what you
6  know about these lawsuits, and the reason I want to
7  have this complaint for you is so I can refresh
8  your memory about it if you need to.
9      A.  Okay.
10     Q.  So looking at Exhibit 97, this is a
11 lawsuit filed in California by Joseph Pfeister --
12         MR. BARNES:  Pfeister.
13         MR. LEE:  Pfeister, thank you.  I knew
14 you would know.
15 BY MR. LEE:
16     Q.  -- Joseph Pfeister against IBM.  Are you
17 familiar with this lawsuit?
18     A.  No.
19     Q.  Do you know a Joseph Pfeister?
20     A.  No.
21     Q.  Not to be confused with Jason Pfister.
22         MR. BARNES:  No, not at all, not at
23 all.
24         (Exhibit 98 was marked for
25          identification, as of 10/19/17.)

## Page 181

1  BY MR. LEE:
2      Q.  All right.  I'm showing you what I have
3  marked as Exhibit 98.  This is a lawsuit filed in
4  North Carolina Federal Court for the Middle
5  District where this same action is pending by Paul
6  Vinson versus IBM.
7          Are you familiar with this lawsuit?
8      A.  No.
9      Q.  Do you know Paul Vinson?
10     A.  No.  It was another acquisition, by the
11 way, but I'm sorry, I won't say.
12     Q.  So the cases you are familiar with are
13 really the ones you gave a deposition in,
14 Schwarzkopf, Kavitz, Wilson and then, of course,
15 this case?
16     A.  Correct.
17     Q.  None of the others; we've gone through
18 15.
19     A.  From '98 to -- correct, I do not know
20 these.
21     Q.  We've gone through 15 different lawsuits
22 just now.
23     A.  I think it looks like '80, correct.  Are
24 those '82?  Through '83.  So '83 through '98, no, I
25 do -- outside of the ones that you just

Richard Martinotti

Page 182

1　highlighted, Schwarzkopf, Kavitz and Wilson.
2　　Q.　Okay.　Do you know if any of these --
3　well, I guess just only the three that you are
4　familiar with, did any of those go to trial?
5　　A.　I don't know.　I don't follow up on
6　that.　I just did the deposition and that's it.
7　　Q.　You've never testified at trial, have
8　you?
9　　A.　I have not testified at trial.
10　　　MR. LEE:　Do you want to take a quick
11　break?　I think I am actually rounding the
12　corner.　I may have just 20 minutes left or
13　something like that.
14　　　MR. BARNES:　Yeah, let's do it.
15　　　MR. LEE:　Great.
16　　　THE VIDEOGRAPHER:　Going off the
17　record at 2:13 p.m.
18　　　(Recess taken, 2:13 - 2:23 p.m.)
19　　　THE VIDEOGRAPHER:　We are back on the
20　record at 2:23 p.m.
21　BY MR. LEE:
22　　Q.　Mr. Martinotti, one of the topics that
23　we had today was the meeting in Chicago that was
24　referenced in an e-mail by Tom Batthany.　Do you
25　know anything about that meeting and what he

Page 183

1　references in his e-mail?
2　　A.　That was a town hall meeting-type
3　meeting.　I didn't attend it, but that's what that
4　was.
5　　Q.　You said a town hall-type meeting.　What
6　does that mean?
7　　A.　We'd get together our sales force and go
8　through current-event type of information.
9　　Q.　Was it everybody from sales reps to VPs?
10　　A.　Administration to -- yeah.　Anyone
11　that's within the software organization -- or not
12　the soft- -- anyone within the Chicagoland area has
13　the ability to go to a town hall, and then they
14　will go through and break out into, you know,
15　different individual tech meetings that are, you
16　know, unique to their specialty.
17　　Q.　Okay.　Well, you said anybody in the
18　Chicagoland area, so it would be this geographic
19　region here?
20　　A.　Correct.
21　　Q.　So Tom Batthany is in Richmond.
22　　A.　Correct.
23　　Q.　What was he doing there?
24　　A.　So I knew you were going to get there.
25　The problem with IBM -- I shouldn't say problem,

Page 184

1　but the organization within IBM is not
2　geographic-centric any more.　So, in other words,
3　we don't have a branch office that represents
4　Chicago.　We have businesses and we have the
5　hardware business, the software business, the
6　services business.　They all have activity.　And as
7　an example, I am in North America software.　I am
8　just housed in Chicago, okay.　A friend of mine can
9　be, you know, in security and he just happens to be
10　housed in Chicago and his territory is all the
11　western portion of the Mississippi.
12　　　So no longer does IBM organize
13　themselves around geographic cities, things in that
14　nature.　We organize ourselves around businesses.
15　So it's the communications business, it's the
16　distribution, it's the insurance, it's that type of
17　situation.
18　　　So everyone that's in Chicago that
19　happens to cover all that is in one of those
20　organizations, we will get together at a town hall
21　meeting, you know, once every six months, once a
22　year just to get, you know, camaraderie, to get
23　things together, and that's what happens.
24　　Q.　So what was Tom doing there, Tom
25　Batthany?

Page 185

1　　A.　Tom was going and representing the
2　people that he has here under his umbrella for
3　his --
4　　Q.　I see.　So he had some sales reps who
5　were in Chicago or in the area?
6　　A.　Yeah.
7　　Q.　And he came to participate and update
8　them on what was going on?
9　　A.　Um-hmm.
10　　Q.　Okay.　That makes sense.
11　　A.　Yes.　I'm sorry.　I should have said
12　"yes" instead of...
13　　Q.　That's all right.　Do you know anyone
14　who was there instead of Tom Batthany?
15　　A.　No, because I did not attend that
16　meeting.
17　　Q.　Okay.　How do you know that that's the
18　meeting he was talking about?
19　　A.　Simply because of the -- what he was --
20　his correspondence and his statement that he was
21　here, and that was the reason why he was here.
22　　Q.　Okay.　You read his e-mail about it, I
23　think a couple e-mails where he referenced it, and
24　from that context you are concluding that it was a
25　town hall meeting for Chicagoland IBM folks?

Richard Martinotti

Page 186

1    A.   Correct.
2    Q.   And as you sit here, you can't identify
3    anyone besides Tom Batthany who was at that
4    meeting?
5    A.   Correct, I cannot.
6    Q.   Have you tried to?
7    A.   No.
8    Q.   Did Ronnie Rohrer make a million dollars
9    in 2015?
10   A.   I don't know.  I would have to go back
11   and look.
12   Q.   You haven't as you sit here today?
13   A.   I have not.
14        (Exhibit 99 was marked for
15        identification, as of 10/19/17.)
16   BY MR. LEE:
17   Q.   I'm showing you what I have marked as
18   Exhibit 99.  This is a copy of IBM's responses to
19   our first set of interrogatories in this case.
20   Have you seen these before?
21   A.   Yes.
22   Q.   And did you assist in answering these
23   interrogatories?
24   A.   I provided whatever archives that I had
25   available.

Page 187

1    Q.   You provided documents; is that what you
2    are saying?
3    A.   Yes.
4    Q.   If you look at Pages 4 and 5, the
5    response to Interrogatory No. 4, this is about the
6    process for determining what commissions will be
7    paid; and I want to ask you a focused question
8    about a portion of the IPL that's quoted in this
9    response.
10        At the very bottom of Page 5 -- read as
11   much of it as you want to.  I don't want to stop
12   you.
13        Down at the last sentence on Page 5 it
14   says, it quotes the language from the IPL that
15   "Managers below the highest level of management do
16   not know whether IBM will or will not change or
17   adopt any particular compensation plan."
18        Do you see that?
19   A.   Correct, yes.
20   Q.   Who is included in this managers below
21   the highest -- well, strike that.  I phrased that
22   incorrectly.
23        What managers are at the highest level
24   of management?
25   A.   Within the geo, within the North America

Page 188

1    organization, it would be John Dunderdale as the
2    North America software.  He would be given a
3    nondisclosure, but nobody below him.
4    Q.   What do you mean, given a nondisclosure?
5    A.   He would sign a nondisclosure saying
6    that, you know, he is being disclosed information
7    that he can't speak about.
8    Q.   What does that have to do with that?
9    A.   So, in other words, when they go through
10   and do reviews of sales plans and updates or
11   changes, they will review it with John for his
12   opinion; and so John knows that potentially we are
13   going to, say, change the SaaS plan or change the
14   transactional plan.  That's what --
15   Q.   So he will know that but he won't
16   disclose it to you --
17   A.   Correct.
18   Q.   -- because you are saying you understand
19   he signed an agreement --
20   A.   Correct.
21   Q.   -- with maybe IBM's management above
22   him --
23   A.   Right.
24   Q.   -- saying that he won't disclose those
25   kinds of things to anyone below his level?

Page 189

1    A.   Correct.
2    Q.   Why is that?
3    A.   You only want information for the
4    current sales plan period that is relevant for the
5    current sales plan period out in the field.  You
6    don't need to go through and discuss and make
7    available any future thoughts or plans because you
8    don't want to influence or negatively influence,
9    positively or negatively influence.
10   Q.   So this comment really relates more to
11   future plans; is that what you are saying?
12   A.   Yes.
13   Q.   All right.
14        (Exhibit 100 was marked for
15        identification, as of 10/19/17.)
16   BY MR. LEE:
17   Q.   Showing you what I have marked as
18   Exhibit 100.  These are IBM's supplemental
19   responses to our first sets of discovery.
20        Have you seen these before?
21   A.   Yeah.
22   Q.   Did you assist in preparing these?
23   A.   Again, with outside of, you know,
24   providing my archives.
25   Q.   Now, if you look at Interrogatory No. 6,

48 (Pages 186 to 189)

Richard Martinotti

Page 190

1  the very last line there refers to some page
2  numbers there. I just want to confirm, the very
3  last -- right here (indicating).
4      A.  Oh, okay.
5      Q.  I just want to confirm that what's been
6  referred to there is that chart, spreadsheet that
7  we have talked about before today.
8      A.  427, yes.
9      Q.  And that's Exhibit...
10     A.  64.
11         MR. LEE: Okay. Great.
12         And Justin, I didn't see a
13  verification on these, but that doesn't mean
14  you didn't give it. I just don't know. Do
15  you know if you guys have done a verification?
16         MR. BARNES: I would assume so, but
17  let me double-check.
18         MR. LEE: I was kind of thinking you
19  did too, but I don't know.
20         MR. BARNES: I can double-check that.
21         MR. LEE: Will Mr. Martinotti be
22  verifying these if he hasn't already, or do
23  you know who would do it?
24         MR. BARNES: Yes.
25         MR. LEE: Do you want to handle it

Page 191

1  real quickly?
2         MR. BARNES: Yeah, sure.
3  BY MR. LEE:
4      Q.  Mr. Martinotti, Exhibits 99 and 100 are
5  the responses to these interrogatories by IBM --
6         MR. BARNES: I know for sure that
7  99 -- I'm sorry to interrupt you.
8         MR. LEE: That's okay.
9         MR. BARNES: I know for sure that we
10  served a verification for 99. I thought we
11  did one for 100 too, but I can't be sure about
12  100, so I don't know if we need to go through
13  the process with 99. I can probably pull that
14  up real quick.
15         MR. LEE: I'm just going to ask him.
16  I think that would pretty much handle it, I
17  think.
18  BY MR. LEE:
19     Q.  Mr. Martinotti, Exhibits 99 and 100,
20  they contain IBM's responses to our
21  interrogatories. Are these responses complete and
22  accurate to the best of IBM's knowledge?
23     A.  Yes.
24         (Exhibit 101 was marked for
25         identification, as of 10/19/17.)

Page 192

1  BY MR. LEE:
2      Q.  All right, Mr. Martinotti. I'm showing
3  you what I have marked as Exhibit 101. It's a copy
4  of IBM's responses to our second set of
5  interrogatories. Have you seen these?
6      A.  Yes.
7      Q.  Are these responses complete and
8  accurate to the best of IBM's knowledge?
9      A.  Yes.
10         MR. LEE: All right. If you will give
11  me one minute just to look over my notes, we
12  may be finished.
13         MR. BARNES: Yes. One minute, that's
14  it, 60 seconds.
15         MR. LEE: Start the clock.
16         MR. BARNES: It's ticking away.
17         MR. LEE: That's all I have.
18  Mr. Martinotti, I appreciate your time today.
19  I don't have any further questions for you.
20         THE WITNESS: Okay.
21         MR. BARNES: I have a couple of
22  followups just to clarify a couple of things.
23              EXAMINATION
24  BY MR. BARNES:
25     Q.  You remember talking earlier about the

Page 193

1  review on the BB&T deal of Bobby's commissions is
2  based on relative contribution. Do you remember
3  saying that?
4      A.  Yes.
5      Q.  "Relative" to me seems that it suggests
6  it's relative to something else, and I just want to
7  make sure we are clear on what you mean by
8  "relative contribution."
9      A.  How his performance matched with the
10  other participants and balanced with the other
11  participants.
12     Q.  And how his pay balanced with the others
13  as well?
14     A.  Yes.
15     Q.  You also remember talking about the
16  Phillips deal earlier today?
17     A.  Yes.
18     Q.  And you explained the differences
19  between that inspection and the BB&T inspection.
20  Do you remember talking about that?
21     A.  Yes.
22     Q.  Is that still considered a significant
23  transaction review, the Phillips deal?
24     A.  Yes.
25     Q.  And IBM's position that it has the

49 (Pages 190 to 193)

Richard Martinotti

Page 194

1 ability to review the commissions in those sorts of
2 deals, what is that based on?
3     A.  I'm not sure I'm following your
4 question.
5     Q.  So is it based on the terms of the IPL?
6     A.  Yes.
7     Q.  Let's look at Exhibit 45 really quick.
8 I just want to make sure this is clear.  If you'd
9 look at the second page of that where it says
10 primary revenue achievement was 3.9 million.
11     A.  Correct.
12     Q.  Is that the total revenue achievement
13 for the first half of '15 --
14     A.  Correct.
15     Q.  -- or just one deal?
16     A.  No.  That's the total for this time
17 period of this specific statement.
18     Q.  Okay.  So the --
19     A.  So this is the full six months or the --
20 yeah, this is the full, so this is everything in
21 his territory.
22     Q.  Okay.  And the incentive amounts that
23 are listed on here, those would be the total
24 amounts for the plan period too, correct?
25     A.  Correct.

Page 195

1     Q.  And then lastly, would you defer to Tom
2 and Haleh's testimony about what they discussed
3 with Bobby Choplin?
4     A.  Yes.
5     Q.  Actually one more, not lastly.  You
6 remember talking about the sales kickoff meeting in
7 Vegas earlier today?
8     A.  Yes.
9     Q.  Do you know whether the word "uncapped"
10 was actually used at that meeting?
11     MR. LEE:  Objection.
12     A.  No.
13     MR. BARNES:  That's all I got.
14     FURTHER EXAMINATION
15 BY MR. LEE:
16     Q.  Mr. Martinotti, what, if any, evidence
17 do you have that Bobby Choplin was ever told that
18 the Phillips deal was reviewed under the
19 significant transaction policy?
20     A.  What evidence?
21     Q.  Yes.
22     A.  I thought there was correspondence with
23 him about Phillip.  There's e-mails with Phillips.
24 Yeah, there's -- aren't there?
25     Q.  Are you saying there is an e-mail that

Page 196

1 informed Bob Choplin directly that the Phillips
2 deal --
3     A.  Let's put it this way:  I don't know.
4     Q.  Mr. Barnes asked you whether the word
5 "uncapped" was used at the 2015 first half kickoff
6 meeting.
7     A.  Yes.
8     Q.  Can you say that it wasn't used?
9     A.  No.
10     MR. LEE:  I don't have any other
11 further questions.   Thank you.
12     MR. BARNES:  We will reserve the right
13 to read and sign.
14     THE VIDEOGRAPHER:  Going off the
15 record at 2:44 p.m.  This concludes the
16 videotaped deposition of Mr. Martinotti.
17     (At 2:44 p.m. the deposition was
18     concluded.)
19
20
21
22
23
24
25

Page 197

1 CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2     I, PAULINE M. VARGO, a Certified
Shorthand Reporter of the State of Illinois,
3 C.S.R. No. 84-1573, do hereby certify:
4     That previous to the commencement of the
examination of the witness, the witness was duly
5 sworn to testify the whole truth concerning the
matters herein;
6
    That the foregoing deposition transcript
7 was reported stenographically by me and thereafter
reduced to typewriting under my personal direction;
8
    That the witness has requested a review
9 of this transcript pursuant to Rule 30(e)(1);
10     That the foregoing constitutes a true
record of the testimony given by said witness
11 before this reporter;
12     That I am not a relative, employee,
attorney or counsel, nor a relative or employee of
13 such attorney or counsel, for any of the parties
hereto, nor interested directly or indirectly in
14 the outcome of this action
15     CERTIFIED TO THIS 27th DAY OF OCTOBER,
A.D., 2017
16
17
    _____
18     Pauline M. Vargo, RPR, CRR
    Illinois Certified Shorthand
    Reporter No. 84-1573
19
20
21
22
23
24
25

Richard Martinotti

Page 198

1    INSTRUCTIONS TO WITNESS

2

3        Please read your deposition over

4    carefully and make any necessary corrections. You

5    should state the reason in the appropriate space on

6    the errata sheet for any corrections that are made.

7        After doing so, please sign the errata

8    sheet and date it.  It will be attached to your

9    deposition.

10        It is imperative that you return the

11    original errata sheet to the deposing attorney

12    within thirty (30) days of receipt of the

13    deposition transcript by you.  If you fail to do

14    so, the deposition transcript may be deemed to be

15    accurate and may be used in court.

16

17

18

19

20

21

22

23

24

25

Page 200

1    CASE NAME:  Choplin vs. IBM

2        1:16-cv-1412-TDS-JEP

3        I hereby certify that I have read the

4    foregoing transcript of my deposition, given on

5    October 19, 2017, at the place aforesaid,

6    consisting of pages 1 through 200, and I do

7    again subscribe and make oath that the same is

8    a true, correct, and complete transcript of my

9    deposition so given as aforesaid, as it now appears.

10    Please check one:

11    _____ I made no corrections

12    _____ Number of errata sheets

13        submitted

14

15    (Signed)

16

17

18        RICHARD MARTINOTTI        DATE

19

20

21    SUBSCRIBED AND SWORN TO

    before me this      day

22    of        , A.D. 20___.

23

        Notary Public

24

25

Page 199

1        E R R A T A

    CASE NAME:  Choplin vs  IBM

2    30(b)(6) DEPOSITION OF:  IBM by RICHARD MARTINOTTI

    DATE TAKEN:  October 19, 2017

3    PAGE LINE CHANGE

4    ___ ___ _____

5        REASON: _____

6    ___ ___ _____

7        REASON: _____

8    ___ ___ _____

9        REASON: _____

10    ___ ___ _____

11        REASON: _____

12    ___ ___ _____

13        REASON: _____

14    ___ ___ _____

15        REASON: _____

16    ___ ___ _____

17        REASON: _____

18    ___ ___ _____

19        REASON: _____

20    ___ ___ _____

21        REASON: _____

22    ___ ___ _____

23        REASON: _____

24    ___ ___ _____

25        REASON: _____

Golkow Litigation Services - 877.370.DEPS